FILED
United States Court of Appeals
Tenth Circuit

**June 10, 2024**

**Christopher M. Wolpert
Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

SCOTT JOHNSON; HARLENE HOYT;
COVEY FIND KENNEL, LLC,

    Plaintiffs - Appellants,

v.

JUSTIN SMITH, D.V.M., in his official
capacity as Animal Health Commissioner
at the Kansas Department of Agriculture,

    Defendant - Appellee.

-----------------------------

THE BUCKEYE INSTITUTE; PACIFIC
LEGAL FOUNDATION; NEW CIVIL
LIBERTIES ALLIANCE; KANSAS PET
ADVOCATES,

    Amici Curiae.

No. 23-3091

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:22-CV-01243-KHV-ADM)**
_____

Samuel G. MacRoberts, Jeffrey S. Shaw, Kansas Justice Institute, Overland Park, Kansas,
for Appellants.

Anthony J. Powell, Kurtis K. Wiard, Office of Attorney General Kris W. Kobach,
Topeka, Kansas, for Appellee.

David C. Tryon and Alex M. Certo, The Buckeye Institute, Columbus, Ohio; filed a brief on behalf of Appellants, for Amicus Curiae The Buckeye Institute.

Daniel T. Woislaw, Alexander J. Smith, Pacific Legal Foundation, Sacramento, California; filed a brief on behalf of Appellants, for Amicus Curiae Pacific Legal Foundation.

Markham S. Chenoweth, New Civil Liberties Alliance, Washington, D.C.; filed a brief on behalf of Appellants, for Amicus Curiae New Civil Liberties Alliance.

Sheila Martinsen, Kansas Pet Advocates, Leawood State, Kansas (joined by Jason Petropoulos, Latham & Watkins LLP, New York, New York and Brittany M.J. Record, Latham & Watkins LLP, Washington, D.C.); filed a brief on behalf of Appellee, for Amicus Curiae Kansas Pet Advocates.

_____

Before **HARTZ**, **PHILLIPS**, and **CARSON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Seeking declaratory and injunctive relief, Plaintiffs Scott Johnson and his wife Harlene Hoyt raise a Fourth Amendment challenge to the constitutionality of a Kansas statute that permits warrantless inspections of their homestead, where Mr. Johnson owns and operates a business that houses and trains bird dogs for their owners. *See* Kan. Stat. Ann. (K.S.A.) § 47-1709(b). They also claim that their constitutional right to travel is infringed by a statutory requirement that they make the premises available for inspection within 30 minutes of the arrival of an inspector. *See id.* § 47-1721(d)(1). The United States District Court for the District of Kansas dismissed their complaint for failure to state a claim, and they appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the dismissal of their right-to-travel claim but remand for further proceedings to determine whether Mr. Johnson's business is closely regulated and, if so, whether

warrantless inspections are reasonable under the Fourth Amendment (as applied to the States under the Fourteenth Amendment).

We first describe the Kansas statute at issue and summarize the controlling Fourth Amendment law before applying that law to the Kansas statute. We then briefly explain why the statute does not violate Plaintiffs' right to travel.

## I.    THE KANSAS PET ANIMAL ACT

The Kansas Pet Animal Act (the Act) regulates those who house pet animals. It imposes licensing requirements, *see* K.S.A. §§ 47-1701–1737 and directs the Animal Health Commissioner of the Kansas Department of Agriculture (the Commissioner) to adopt rules and regulations for licensees regarding, among other things, reasonable treatment of animals, inspections of licensed premises, and recordkeeping, *see id.* § 47-1712(a); *id.* § 47-1701(i) (defining *Commissioner*).

The Act distinguishes eight different types of licensees: (1) a boarding- or training-kennel-operator license is required for anyone, except a licensed veterinarian, "who operates an establishment where four or more dogs or cats, or both, are maintained in any one week during the license year for boarding, training or similar purposes for a fee or compensation," *id.* § 47-1701(p); *see id.* § 47-1723(a); (2) an animal-distributor license is required for anyone who is "engaged in the business of buying for resale dogs or cats," *id.* § 47-1701(z), (aa); *see id.* § 47-1702; (3) a pet-shop-operator license is required for anyone who operates premises where animals are sold at retail, *see id.* § 47-1701(t), (u); *id.* § 47-1703; (4) a pound or animal-shelter license is required for anyone except a licensed veterinarian who operates a facility used to "house, contain, impound or

harbor any seized stray, homeless, relinquished or abandoned animal or a person who acts as an animal rescuer, or who collects and cares for unwanted animals or offers them for adoption," *id.* § 47-1701(g); *see id.* § 47-1704(a); (5) a research-facility license is required for anyone who operates "any place, laboratory or institution, except an elementary school, secondary school, college or university, at which any scientific test, experiment or investigation involving the use of any living animal is carried out, conducted or attempted," *id.* § 47-1701(w); *see id.* § 47-1720; (6) a hobby-breeder license is required for anyone who operates "premises where all or part of three, four or five litters of dogs or cats, or both, are produced for sale or sold, offered or maintained for sale per license year," if the total number of dogs and cats sold, offered, or maintained for sale is less than 30, *id.* § 47-1701(m), (n); *see id.* § 47-1719; (7) an animal-breeder license is required for anyone who operates premises "where all or part of six or more litters of dogs or cats, or both, or 30 or more dogs or cats, or both, are sold, or offered or maintained for sale, primarily at wholesale for resale to another," *id.* § 47-1701(e), (f); *see id.* § 47-1733; and (8) a retail-breeder license is required for anyone who operates premises "where all or part of six or more litters or 30 or more dogs or cats, or both, are sold, or offered or maintained for sale, primarily at retail and not for resale to another," *id.* § 47-1701(ff), (gg); *see id.* § 47-1736.

The Act has expanded its reach over time. As originally enacted in 1972, it covered only animal "dealers," pet-shop operators, pounds or animal shelters, and research facilities. 1972 Kan. Sess. Laws Ch. 201 §§ 2–5. In 1991 the Act was amended to include kennel operators, *see* 1991 Kan. Sess. Laws Ch. 152 §§ 21, 22 (defining *kennel*

*operator* as "any person who operates an establishment where animals are maintained for boarding or similar purposes for a fee or compensation"), and a 1996 amendment clarified that those who maintain dogs for training purposes (such as Mr. Johnson) are included in that definition, *see* 1996 Kan. Sess. Laws Ch. 151 § 6. Animal breeders, retail breeders, and hobby breeders were also added in 1996. *See id.* Ch. 151 §§ 2, 5, 19.

A number of regulations promulgated under the Act apply generally across licensees, such as those relating to record keeping, *see* Kan. Admin. Regs. (K.A.R.) § 9-18-7, and certain standards for the housing, handling, and caretaking of animals, *see id.* §§ 9-18-10–9-18-15, 9-18-17–9-18-22, 9-18-31.

But in other respects the various types of licensees are treated differently. For example, animal breeders and animal distributors are exempted from many housing and caretaking standards because they already have to comply with federal regulations under the Animal Welfare Act (AWA), 7 U.S.C §§ 2131–60. *See* K.S.A. § 47-1712(b); K.A.R. § 9-18-24. Roughly speaking, the AWA requires licenses for those engaged in interstate commerce, other than common carriers, who sell or transport animals for use as a pet, for research, or for exhibition, *see* 7 U.S.C. §§ 2132, 2134, and requires certain other businesses engaged in the animal trade to register with the Secretary of Agriculture, *see id.* §§ 2132, 2136. The chief purpose of the AWA is to ensure humane treatment of animals by those holding or transporting them, *see id.* § 2131, and it authorizes the Secretary of Agriculture to promulgate rules to effectuate this purpose, *see id.* § 2151.

Other restrictions under the Act apply to some types of licensees but not others. *See e.g.* K.S.A. § 47-1711 (prohibiting animal-control officers from obtaining an animal-

distributor, animal-breeder, retail-breeder, hobby-breeder, or pet-shop-operator license); K.A.R. § 9-18-16 (requiring that sexually intact adult animals not be housed with sexually intact animals of the opposite sex within an animal shelter, rescue network, or pet-animal foster home); *id.* § 9-18-25 (prohibiting the sale or gift of certain animals by pet shops); *id.* § 9-18-30 (restricting tethering of animals at boarding or training kennels). Annual fees for the various licenses range from $125 to $600. *See  id.* § 9-18-6.

All licensees are subject to inspection. First, an applicant must pass an initial inspection of its premises. *See* K.S.A. § 47-1709(a). "The application for a license shall conclusively be deemed to be the consent of the applicant to the right of entry and inspection of the premises." *Id.* Notice "need not be given" before inspection. *Id.*

Once an operator becomes licensed, officials may conduct routine inspections "at reasonable times with the owner or owner's representative present." *Id.* § 47-1709(b). Acceptance of a license "shall conclusively be deemed to be . . . consent" to such searches. *Id.* Although the Act once permitted inspectors to give prior notice of routine inspections, a 2018 amendment provides that prior notice of inspection "shall not be given." *Id.* (current provision); *see* 2018 Kans. Laws Ch. 55 § 5 (amendment).

Refusing inspection "shall be grounds for suspension or revocation of the license." K.S.A. § 47-1709(b). And failure of an owner or licensee, or a designated representative, to make the premises available for inspection within 30 minutes of the inspector's arrival results in a $200 no-contact fee. *See id.* § 47-1721(d)(1). If an inspector is denied access to the premises, the Commissioner "may apply to any court of competent jurisdiction for an administrative search warrant authorizing access to such location for such purposes.

Upon such application and a showing of cause therefore, the court shall issue the search warrant for the purposes requested." *Id.* § 47-1709(k). A violation of the Act or its regulations constitutes a class A nonperson misdemeanor, *see id.* § 47-1715(a), and the Commissioner, upon finding a violation, may impose a civil penalty not exceeding $1,000 or require attendance at an educational course, *see id.* § 47-1707(a).

We now turn to considering whether the Kansas statute violates the Fourth Amendment.

## II.    FOURTH AMENDMENT

The great majority of disputes under the Fourth Amendment concern investigations of crime. But for more than 50 years the Supreme Court has recognized that regulatory inspections are also constrained by that Amendment.

In *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 525–26 (1967), a San Francisco public-health housing inspector was making a routine annual inspection of an apartment building when the building manager informed him that the ground-floor tenant, Roland Camara, was using a portion of the floor as a personal residence, contrary to the occupancy permit for the building. The inspector confronted Camara and demanded that he be permitted to conduct an inspection. *See id.* at 526. Camara refused because the inspector did not have a search warrant. *See id.* City officials made several more attempts to make Camara comply with a local ordinance permitting warrantless inspections of any building by authorized city employees "at reasonable times . . . to perform any duty imposed upon them by the Municipal Code." *Id.* (internal quotation marks omitted).

When ultimately a criminal complaint was filed against Camara, he filed a petition for writ of prohibition, which was reviewed by the United States Supreme Court. *See id.* at 527. The Court held that a warrantless search would violate the Fourth Amendment. *See id.* at 527–28. It reasoned that warrantless administrative searches "lack the traditional safeguards which the Fourth Amendment guarantees to the individual." *Id.* at 534. Without a warrant, "the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." *Id.* at 532. But the Court declined to impose a requirement that warrants may be issued only upon probable cause to believe a particular dwelling contains a violation of the code. *See id.* at 534. Rather, probable cause to issue a warrant "must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* at 538. Such standards may be based simply on the "passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area" and need not "depend upon specific knowledge of the condition of the particular dwelling." *Id.* The court recognized, however, that warrantless inspections may be appropriate in an emergency. *See id.* at 539.

In the companion case of *See v. City of Seattle*, 387 U.S. 541, 542–43 (1967), the Court held that the principles in *Camara* extend to fire-code inspections of commercial premises that are not private dwellings. In *See* the owner of a commercial

Page **8**

warehouse sought reversal of his conviction for refusing to permit a fire-department representative to enter and inspect his warehouse without a warrant. *See id.* at 541. The Court saw "no justification for so relaxing Fourth Amendment safeguards where the official inspection is intended to aid enforcement of laws prescribing minimum physical standards for commercial premises." *Id.* at 543. "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Id.*

Not long after those opinions, however, the Supreme Court recognized exceptions to the general rule when inspections infringed little on reasonable expectations of privacy and requiring warrants would frustrate the legitimate purposes of the regulatory scheme or would serve little purpose in light of the statutory constraints on inspections. *See Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970); *United States v. Biswell*, 406 U.S. 311 (1972); *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978); *Donovan v. Dewey*, 452 U.S. 594 (1981); *New York v. Burger*, 482 U.S. 691 (1987). Warrantless inspections of certain businesses or industries are constitutionally permissible when the regulatory regime authorizing the inspections passes a two-part test. First, the business or industry to be inspected must be "closely regulated." *Burger*, 482 U.S. at 700**.** Then, the regime must satisfy three additional criteria (generally referred to as the *Burger* criteria) for warrantless inspections to be reasonable under the Fourth Amendment: (1) "[T]here must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be necessary to further the regulatory

Page **9**

scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Id.* (brackets and internal quotation marks omitted).[1]

Although the pre-*Burger* cases did not explicitly apply the test, they illustrate what its components mean and how they might be applied. We address each case in turn.

### A.    *Burger* and its Predecessors

In *Colonnade Catering* a catering business was licensed to serve alcoholic beverages in New York and was subject to federal tax obligations on liquor dealers. *See* 397 U.S. at 72. A federal agent for the Alcohol and Tobacco Tax Division of the Internal Revenue Service was a guest at a party at the business and noted a possible tax violation. *See id.* at 72–73. Federal agents later visited the premises and asked the president of the business to open a locked liquor storeroom, but he refused. *See id.* at 73. When he asked whether the agents had a search warrant, they said that they did not need one. *See id.* The president still refused to unlock the storeroom, so an agent

---

[1] We reject Plaintiffs' argument that the exception to the warrant requirement for closely regulated industries is unavailable "[w]hen the home is involved." Aplt. Br. at 17. When "the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street." *Lewis v. United States*, 385 U.S. 206, 211 (1966). Thus, courts have permitted warrantless administrative searches of homes in which closely regulated businesses were operated. *See Rush v. Obledo*, 756 F.2d 713, 723 (9th Cir. 1985) (closely-regulated-industry exception to warrant requirement extended to day-care facilities run out of a provider's residence); *United States v. Cerri*, 753 F.2d 61, 64 (7th Cir. 1985) (rejecting Fourth Amendment challenge to a warrantless administrative search of a gun dealer's home because "[w]hen used as a place of business, the home has the same status under the Fourth Amendment as any other place of business").

broke the lock and entered, removing liquor bottles suspected of being illegally refilled. *See id.* The catering business sued to recover the liquor bottles and suppress them as evidence. *See id.* at 72.

The Supreme Court considered "the long history of the regulation of the liquor industry during pre-Fourth Amendment days," including laws in England and the colonies permitting warrantless inspections of liquor businesses. *Id.* at 75. And it observed that in 1791 (the year the Fourth Amendment was ratified) Congress imposed a liquor excise tax and permitted federal officials to enforce the tax by inspecting distillers and liquor importers without a warrant. *See id.* The Court concluded that "Congress has broad power to design such powers of inspection under the liquor laws as it deems necessary to meet the evils at hand," and that "[t]he general rule laid down in *See v. City of Seattle* . . . is therefore not applicable here." *Id.* at 76. Although the Court upheld the right to conduct a warrantless inspection, it said that the applicable statute did not authorize the forcible entry; it only made it an offense, punishable by fine, to refuse entry. *See id.* at 77.

In *Biswell* a policeman and a Federal Treasury agent visited the business of a pawn-shop operator federally licensed to deal in sporting weapons, inspected his books, and requested entry into a locked gun storeroom. *See* 406 U.S. at 312. When the operator asked whether the agent had a warrant, the agent responded that he did not need one because the inspection was authorized by law. *See id.* The operator, submitting to the assertion of authority, unlocked the storeroom, where the agent found and seized two sawed-off rifles that the operator was not licensed to possess.

*See id.* The operator appealed his conviction of dealing in firearms without having paid the required special occupational tax. *See id.* at 312–13.

The Supreme Court held that the warrantless inspection did not violate the Fourth Amendment, given the important government interests served by warrantless inspections of firearms dealers and their limited infringement on dealers' reasonable expectations of privacy. *See id.* at 315–16. The Court acknowledged that federal regulation of firearms is "not as deeply rooted in history as is governmental control of the liquor industry." *Id.* at 315. But relying on congressional findings, it said that "close scrutiny of [interstate firearm] traffic is undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders." *Id.* It said that "inspection is a crucial part of the regulatory scheme, since it assures that weapons are distributed through regular channels and in a traceable manner and makes possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms." *Id.* at 315–16. Unlike *See*, in which "the mission of the inspection system was to discover and correct violations of the building code, conditions that were relatively difficult to conceal or to correct in a short time," warrantless inspections were necessary in this context. *Id.* at 316. "Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible." *Id.* Further, the Court said that the

Page **12**

warrantless searches in this context "pose only limited threats to the dealer's justifiable expectations of privacy," because "[w]hen a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." *Id*. Finally, because every dealer annually receives a copy of the laws "that describe his obligations and define the inspector's authority[,] [t]he dealer is not left to wonder about the purposes of the inspector or the limits of his task," *id.* (citation omitted), a concern raised in *Camara* in support of a warrant requirement, *see* 387 U.S. at 532.

In *Barlow's* an Occupational Safety and Health Act (OSHA) inspector entered the customer-service area of an electrical- and plumbing-installation business. *See* 436 U.S. at 309. The inspector informed the general manager that he wanted to conduct a search of the working areas of the business. *See id.* at 309–10. The search was authorized by OSHA, which permitted inspectors to conduct a warrantless search of the work area of any business within its jurisdiction for safety violations. *See id.* at 309. After the inspector said that he had not received a complaint and did not have a search warrant, the general manager refused to admit him. *See id.* at 310. The government obtained an order from a federal district court compelling the business to admit the inspector. *See id.* But a three-judge district court held that warrantless inspections authorized by OSHA violated the Fourth Amendment. *See id.*

The Supreme Court agreed. It distinguished *Colonnade Catering* and *Biswell* on the ground that they "represent responses to relatively unique circumstances." *Id.*

Page **13**

at 313. "Certain industries," such as liquor and firearms, it said, "have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise. . . . [W]hen an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation." *Id.* (citation omitted). The Court rejected the government's argument that the installation business was closely regulated because it was subject to the same general minimum-wage and maximum-hours laws that all businesses engaged in interstate commerce are subject to, observing that "the degree of federal involvement in employee working circumstances has never been of the order of specificity and pervasiveness that OSHA mandates." *Id.* at 314.

The Court also rejected the government's argument that warrantless inspections were necessary to "preserve the advantages of surprise," because businesses could correct their violations "during the interval between an inspector's initial request to search a plant and his procuring a warrant following the owner's refusal of permission." *Id.* at 316. While acknowledging that OSHA "regulates a myriad of safety details that may be amenable to speedy alteration or disguise," the Court noted that "warrants may be issued *ex parte* and executed without delay and without prior notice, thereby preserving the element of surprise," and, since "the great majority of businessmen can be expected in normal course to consent to inspection without warrant," it was unconvinced that a warrant requirement would "impose serious burdens on the inspection system or the courts." *Id.* Moreover, given the modified probable-cause standard for administrative search warrants, the Court

Page **14**

"doubt[ed] that the consumption of enforcement energies in the obtaining of such warrants will exceed manageable proportions." *Id.* at 321. Finally, the Court rejected the government's argument that the "incremental protections afforded the employer's privacy by a warrant" were only "marginal." *Id.* at 322. It described the statutory authorization as "devolv[ing] almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." *Id.* at 323. "A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria." *Id.*

In *Dewey* a federal mine inspector attempted to inspect stone quarries to determine whether violations uncovered during a prior inspection had been corrected. *See* 452 U.S. at 597. The inspection was authorized by the Federal Mine Safety and Health Act (FMSHA), which permitted inspectors "to inspect underground mines at least four times per year and surface mines at least twice a year . . . and to make followup inspections to determine whether previously discovered violations have been corrected," granted them a "right of entry" into mines, and did not permit advance notice of inspections. *Id.* at 596 (internal quotation marks omitted). After the mine owner's president refused to permit the inspection unless the inspector obtained a warrant, the government filed a civil action to enjoin him from refusing to permit warrantless inspections. *See id.* at 597.

Page **15**

The Supreme Court held that warrantless inspections under the FMSHA were reasonable under the Fourth Amendment. *See id.* at 596. It described the governing law as follows: "Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests." *Id.* at 599. And "warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner . . . has no real expectation that his property will from time to time be inspected by government officials." *Id.* On the other hand, "a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 600.

The Court began its analysis of the FMSHA with the prerequisites that it viewed as undisputed: "As an initial matter, . . . there is a substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines. In enacting the statute, Congress was plainly aware that the mining industry is among the most hazardous in the country . . . ." *Id.* at 602. Second, "Congress in this case could reasonably determine . . . that a system of warrantless inspections was necessary if the law is to be properly enforced and inspection made effective. In designing an inspection program, Congress expressly recognized that a warrant requirement could significantly frustrate effective enforcement of the Act."

*Id.* at 602–03 (citation and internal quotation marks omitted).

It then addressed "the only real issue before us"—"whether the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant." *Id.* at 603. The Court held that it did: Regulation under the FMSHA is "sufficiently pervasive and defined that the owner of [a mine] cannot help but be aware that he will be subject to effective inspection." *Id.* (internal quotation marks omitted). The statute required "inspection of *all* mines and specifically define[d] the frequency of inspection," and all standards that mines were required to comply with were specifically set forth by the FMSHA or the regulations promulgated under it. *Id.* at 603–04. "Thus, rather than leaving the frequency and purpose of inspections to the unchecked discretion of Government officers, the Act establishe[d] a predictable and guided federal regulatory presence. . . . [T]he operator of a mine is not left to wonder about the purposes of the inspector or the limits of his task." *Id.* at 604 (internal quotation marks omitted). And the Court noted that the FMSHA accommodated "any special privacy concerns that a specific mine operator might have," by prohibiting forcible entries and instead requiring the government to obtain an injunction against future refusals if refused entry, thus providing an adequate forum to address such concerns. *Id.*

The Court also rejected the operator's argument that warrantless inspections of stone quarries specifically are unconstitutional because stone quarries did not come under federal regulation until 1966 and therefore lacked a "long tradition of

**Page 17**

government regulation." *Id.* at 605 (internal quotation marks omitted). It explained that "it is the pervasiveness and regularity of the federal regulation that ultimately determines whether a warrant is necessary to render an inspection program reasonable under the Fourth Amendment." *Id*. at 606. While the "duration of a particular regulatory scheme will often be an important factor in determining whether it is sufficiently pervasive," making that the exclusive criterion would create "absurd results," since emerging industries that pose serious health and safety risks, such as the nuclear-power industry, could never be made subject to warrantless inspections. *Id.*

Finally, in *Burger* the Supreme Court articulated the current legal framework for applying the closely-regulated-industry exception. New York City police officers entered an automobile junkyard and asked to see the owner's license to operate a vehicle-dismantling business and the record of automobiles and automobile parts in his possession. *See* 482 U.S. at 693–95 & n.3. The owner replied that he had neither a license nor such a record. *See id.* at 695. The officers announced their intention to conduct an inspection under New York Vehicle & Traffic Law § 415-a5, and the owner did not object. *See Burger*, 482 U.S. at 695. The officers copied down the vehicle-identification numbers of vehicles and vehicle parts in the junkyard and determined that the owner was in possession of stolen vehicles and parts. *See id.* The owner was charged with possession of stolen property and moved to suppress evidence obtained from the inspection. *See id.* at 695–96.

Page **18**

The Court reviewed its four precedents recognizing an exception to the warrant requirement for administrative searches of "commercial property employed in 'closely regulated' industries," *id.* at 700, and held that the junkyard at issue was in such an industry, *see id.* at 703–04. It pointed to the extensive requirements imposed by New York's statute regulating automobile junkyards (which was enforceable by criminal penalties), including that the operator needed to obtain a license, needed to maintain records of the acquisition and disposition of vehicles and their parts and make the inventory and records available for inspection, and needed to display the business registration number on the business premises, on business documents, and "on vehicles and parts that pass through [the] business." *Id.* at 704–05. It noted 38 similar statutes in other States. *See id.* at 698 n.11, 705. Although it acknowledged that the automobile-junkyard statute had been enacted less than 10 years before the challenged inspection (and the inspection provision had been in effect for only three years), it said that the need for regulation had been recent since "automobile junkyards and vehicle dismantlers have not been in existence very long," and it observed that the "automobile-junkyard business . . . is simply a new branch of an industry that has existed, and has been closely regulated, for many years"— general junkyards and secondhand shops. *Id.* at 705–06. Indeed, "warrantless inspection provisions for junk shops have been a part of the law of the City of New York and of Brooklyn for at least 140 years." *Id.* at 707 (internal quotation marks omitted). The Court concluded that because the automobile-junkyard business was closely

Page **19**

regulated, "an operator of a junkyard engaging in vehicle dismantling has a reduced expectation of privacy." *Id.*

The next issue for the Court was whether warrantless-search authority was reasonable for this closely regulated industry. It drew from its four precedents that warrantless inspections of closely regulated businesses are reasonable only if the following three criteria are met: (1) "[T]here must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be necessary to further the regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Id.* at 702–03 (brackets and internal quotation marks omitted). It determined that each of those criteria was satisfied.

In determining that the first criterion was satisfied the Court pointed to a serious problem (motor-vehicle theft) that was tied to the regulated industry (automobile junkyards) and would likely be ameliorated by regulating the industry (by reducing the market for stolen vehicles and their parts). The Court relied on legislative statements and reports as support for the proposition that New York had a "substantial interest in regulating the vehicle-dismantling and automobile-junkyard industry because motor vehicle theft has increased in the State and because the problem of theft is associated with this industry." *Id.* at 708. And it said that the State could rationally believe that "regulation of the vehicle-dismantling industry reasonably serves the State's substantial interest in eradicating automobile theft,"

**Page 20**

citing evidence that the industry provides "the major market for stolen vehicles and vehicle parts." *Id.* at 709.

As for the second criterion—the need for warrantless inspections—the Court said that because "stolen cars and parts often pass quickly through an automobile junkyard, frequent and unannounced inspections are necessary in order to detect them." *Id.* at 710 (internal quotation marks omitted). And the third criterion—that the statute provided a constitutionally adequate substitute for a warrant—was satisfied because the state law informed operators of automobile junkyards that inspections will be made on a regular basis by police officers, notified them of how to comply with the statute, permitted inspections only during "regular and usual business hours," and "narrowly defined" the scope of permissible searches to include only records and vehicles or vehicle parts subject to record-keeping requirements. *Id.* at 711–12 (internal quotation marks omitted).

### B.    *Patel*

Nearly three decades after *Burger*, the Supreme Court again addressed the closely-regulated-industry exception in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), this time emphasizing the limits to the exception. Motel operators sued the City of Los Angeles challenging the constitutionality of a provision of the municipal code compelling "every operator of a hotel to keep a record containing specified information concerning guests and to make this record available to any officer of the Los Angeles Police Department for inspection on demand." *Id.* at 412 (brackets and internal quotation marks omitted). The Court held that hotel operators could not be compelled to make their guests

Page **21**

registries available to the police without being "afforded an *opportunity* to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply." *Id.* at 421.

The Court said that "[t]o classify hotels as pervasively regulated would permit what has always been a narrow exception to swallow the rule." *Id.* at 424–25. It explained that hotels are not a closely regulated industry because, as in *Barlow's*, requirements that hotels "maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards" do not "establish a comprehensive scheme of regulation that distinguishes hotels from numerous other businesses" and "that puts hotel owners on notice that their property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 425 (internal quotation marks omitted). "If such general regulations were sufficient to invoke the closely regulated industry exception," wrote the Court, "it would be hard to imagine a type of business that would not qualify." *Id.* The Court compared those regulations "to the widely applicable minimum wage and maximum hour rules that the Court rejected as a basis for deeming the entirety of American interstate commerce to be closely regulated in *Barlow's*." *Id.* (internal quotation marks omitted). The Court was unpersuaded by the City's citation to historical regulations that treated hotels as public accommodations because "laws obligating inns to provide suitable lodging to all paying guests are not the same as laws subjecting inns to warrantless searches." *Id.* at 426.

Moreover, the Court found that two of *Burger*'s criteria for a search of a closely regulated business to be reasonable were not satisfied. (It assumed that the

Page **22**

substantial-government-interest requirement was satisfied.) *See id.* Following

*Barlow's*, it saw no reason to think that a warrant requirement would undermine

searches of hotel registries "by giving operators a chance to falsify their records." *Id.*

at 427. The Court noted that officers could conduct surprise inspections through *ex*

*parte* warrants, and registries could be guarded pending a hearing on a motion to

quash. *See id.* Although the dissent claimed that such procedures would be overly

burdensome given the large number of hotels in the City, the Court said that there

was "no basis to believe that resort to such measures will be needed," since the City

cited no evidence that hotel operators would regularly refuse to cooperate. *Id.*; *see id.*

at 422. In addition, the inspection provision, which required every hotel operator to

make the records "available to any officer of the Los Angeles Police Department for

inspection on demand," *id.* at 412 (internal quotation marks omitted), did not impose

any standards constraining officer discretion on which hotels to search and when, and

was therefore not a constitutionally adequate substitute for a warrant, *see id.* at 427–

28.

We highlight two important features of the Court's application of the closely-

regulated-business doctrine in *Patel*. First, the Court explicitly declined to consider the

intrusiveness of the specific inspection provision under challenge in deciding whether the

businesses had a reasonable expectation of privacy, saying that "[t]he City wisely refrains

from arguing that [the challenged regulation] itself renders hotels closely regulated." *Id.*

at 425. Otherwise, the inspection provision would be self-justifying. *See Free Speech*

*Coal., Inc. v. Att'y Gen.*, 825 F.3d 149, 170 (3d Cir. 2016) ("We are doubtful that the

Government can create the reduced expectation of privacy of a closely regulated industry to justify warrantless inspections by simply mandating those inspections, particularly where that industry existed long before the regulation's enactment.").

Second, the Court observed that every industry that it had held to be closely regulated was one that would pose a threat to public welfare if left unregulated. Unlike those industries, "nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare." *Patel*, 576 U.S. at 424. The Court said that the absence of such a threat argued against hotels being considered closely regulated. *See id.*[2]

We would add, however, that by the same token, as the Court observed in *Dewey*, the existence of such a threat to the public welfare can also argue in the other direction. If the new industry presents a substantial new threat (such as the nuclear-power industry), it could still be considered closely regulated despite the absence of any history specific to the industry. *See Dewey*, 452 U.S. at 606. The rationale for considering the

---

[2] *Patel*'s consideration of the fact that hotels do not pose an inherent risk departed from the "previous common assumption" that whether an industry is closely regulated does not have to do with the risk of harm it poses but with the reasonable expectations of those who enter the industry. 5 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 10.2(a), at 55 (6th ed. 2022). Since *Patel*, other circuits have grappled with the extent to which an industry's danger is relevant to whether it is closely regulated. The Fifth, Sixth, and Seventh Circuits view it as just a factor*, see Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 967–68 (5th Cir. 2023); *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 284 (6th Cir. 2018); *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 893–94 (7th Cir. 2016), while the Eighth Circuit seems to view it as a requirement, *see Calzone v. Olson*, 931 F.3d 722, 724 (8th Cir. 2019) ("But in the case of commercial property that is involved in a closely regulated industry whose operation poses a clear and significant risk to the public welfare, the property owner has a reduced expectation of privacy . . . ." (citation and internal quotation marks omitted)).

dangerousness of an industry to support or reject its characterization as closely regulated would seem to be that in determining whether a business owner can reasonably expect privacy, those who engage in dangerous activities can more likely expect to be subject to intrusive regulation and inspection.

We conclude from *Patel* and its precursors, particularly *Burger*, that the relevant factors for determining whether an industry is closely regulated are the history of warrantless inspections in the industry, the extensiveness and intrusiveness of the regulatory scheme, whether other jurisdictions impose similar regulatory schemes, and "whether the industry would pose a threat to the public welfare if left unregulated." *Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019).

Finally, Plaintiffs' opening brief contends that the district court erred by "apply[ing] the pervasively regulated industry exception—premised on reduced expectations of privacy—to [their] property-based physical intrusion claims." Aplt. Br. at 33 (citation omitted). According to Plaintiffs, recent Supreme Court decisions suggest that when there has been a physical intrusion, there is a search regardless of whether there has been an invasion of a reasonable expectation of privacy. *See Florida v. Jardines*, 569 U.S. 1, 5–6 (2013); *United States v. Jones*, 565 U.S. 400, 406–11 (2012). But the cases invoking the closely-regulated-industry exception have never suggested that the inspections at issue were not searches. They have simply held that the searches are reasonable in part because of the lesser reasonable expectation of privacy in that context. In any event, and more importantly, *Patel* gave no hint of a revised approach to regulatory inspections resulting from the Court's

recent Fourth Amendment trespass jurisprudence. We therefore analyze the issue here in conformance with controlling precedent.

We now turn to the specific challenges made by Plaintiffs to warrantless inspections under the Kansas Pet Animal Act.

### III.    APPLICATION TO THE KANSAS PET ANIMAL ACT

Plaintiffs complain that warrantless inspections under the Kansas Pet Animal Act violate the Fourth Amendment as applied to Mr. Johnson's training kennel. Our review of the district court's ruling on a motion to dismiss is de novo, "accepting all well-pleaded allegations of the complaint as true and considering them in the light most favorable to the nonmoving party." *Big Cats of Serenity Springs, Inc. v. Rhodes* (*Big Cats*), 843 F.3d 853, 858 (10th Cir. 2016) (brackets and internal quotation marks omitted).

### A.    Defining the Industry

In disputing whether Mr. Johnson's business is part of a closely regulated industry, the parties disagree on how to categorize that business. Plaintiffs alleged that Mr. Johnson holds a "training kennel license." Aplt. App., Vol. I at 29. They argue that his business is the "training and handling of hunting dogs," which, they say, is not closely regulated, Aplt. Br. at 22, and that the warrantless inspection regime does not satisfy the *Burger* criteria as applied to that industry. The government argues that there is no meaningful difference between the various types of businesses that house animals and are governed by the Act. It therefore relies on authority supporting warrantless searches under other statutes regulating businesses that house animals.

**Page 26**

We agree with the government insofar as it is saying that we should not exempt a business from a reasonable regulatory scheme simply because it may have some idiosyncratic feature that could argue against some aspect of the scheme. In reviewing challenges to a warrantless-inspection regime, courts have on occasion declined to adopt the challenger's categorization of its business as belonging to a distinct subset of the regulated industry. For example, the Supreme Court rejected a Fourth Amendment challenge "as applied" to sub-industry in *Dewey*, 452 U.S. at 605–06. The stone-quarry operator contended that it should not be subject to an inspection regime that applied to underground and surface mines. *See id.* at 596–97. But the only distinction the operator drew between stone quarries and general mining was that stone quarries had only recently come under regulation (15 years before the decision). *See id.* at 605–06. The Court was not persuaded, noting that although history is a factor, it is not "the only criterion" for whether a warrantless inspection regime is permissible. *Id.* at 606. It pointed out that the record did not support any distinction between the government interest in regulating stone quarries and the government interest in regulating mining generally:

> Although Congress did not make explicit reference to stone quarries in these findings, stone quarries were deliberately included within the scope of the statute. Since the Mine Safety and Health Act . . . is narrowly and explicitly directed at inherently dangerous industrial activity, the inclusion of stone quarries in the statute is presumptively equivalent to a finding that the stone quarrying industry is inherently dangerous.

*Id.* at 602 n.7.

Similarly, in *Calzone v. Olson*, 931 F.3d 722, 724 (8th Cir. 2019), a dump-truck operator challenged a statute authorizing warrantless inspections of "commercial motor

vehicles." The operator argued that he was not part of the closely regulated commercial-trucking industry because his dump truck, which was used only "in association with his ranch," was exempt from most regulations. *Id.* at 725–26. The court ruled that he was within the closely regulated industry because he was still "subject to a broad range of regulations that include height, weight, and length restrictions, licensing standards, state-conducted inspection requirements, and safety standards," and that the state had "a substantial interest in ensuring the safety of the motorists on its highways and in minimizing damage to the highways from overweight vehicles, and that interest does not dissipate simply because [the operator]'s commercial activity is on behalf of his own ranch rather than for hire." *Id.* at 726 (citation and internal quotation marks omitted). It therefore determined that the statute satisfied the *Burger* criteria as applied to him. *See id.* at 726–27.

On the other hand, a sub-industry challenge may succeed when the challenger can show that the sub-industry is significantly different from the general industry with respect to features that are relevant to inspections. Because the closely-regulated-industry exception "is narrow," "courts must not define the industry at issue at too high a level of generality." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 968 (5th Cir. 2023). In that case the Fifth Circuit reversed the district court, which held that a regulation requiring charter boats to install a monitoring system that transmits GPS location to the government did not violate the Fourth Amendment because the "general fishing industry is closely regulated." *Id.* The Fifth Circuit, stating that the GPS-locator requirement "appears to be a search," *id.* at 967, decided that the charter-boat fishing

Page **28**

industry, as opposed to the fishing industry in general, was the relevant industry because "federal statutes and regulations distinguish between fishing and charter-boat fishing" and "the record shows there are significant differences between the charter-boat fishing industry and the general commercial fishing industry," such as evidence that charter-boat fishing makes up a minute percentage of overall fishing, *id.* at 969. The suggestion that overfishing by the fishing industry would pose a threat to public welfare if left unregulated did not show that charter boats were part of a closely regulated industry. *See id.* at 970.

Here, Plaintiffs contend that Mr. Johnson's business should be distinguished from kennels operated by breeders, distributors, and pet shops. Those other kennels may need to be stringently inspected by government authorities to be sure that the animals are being properly cared for. But when it comes to Mr. Johnson's kennel, there are already third parties with a strong interest in the treatment of the animals. Indeed, the owners of the animals housed in Mr. Johnson's kennel have a much stronger, and more personal, interest than any government inspector. If he fails to take good care of the dogs in his kennel, his business is in jeopardy.

At this stage of the proceeding we must credit the allegation in the complaint that "training kennels and their operations are substantially, completely, and markedly different from other animal-related operations like animal breeding, animal distribution, and pet shop sales for a number of reasons, not the least of which is that dog owners

already hold trainers and handlers accountable." Aplt. App., Vol. I at 38.[3] And there is

substantial evidence that this distinction is widely recognized. As we have observed,

Kansas treats these types of kennels as a distinct category of business, requiring them to

obtain boarding- or training-kennel licenses rather than any of the other types of licenses

created by the Act. And statutes in a number of jurisdictions, including the federal

Animal Welfare Act, regulate other categories of pet-animal businesses without

regulating boarding or training kennels. From what we can determine, 34 States have

statutes regulating pet-animal businesses but only 20 States regulate boarding or training

kennels and only 9 of those States permit unannounced warrantless inspections beyond

those for initial licensure or in response to a complaint.[4] This absence of similar

regulation of boarding or training kennels in other jurisdictions is relevant for at least two

reasons. It raises questions about the need for such regulation, and it raises questions

about the reasonable expectations of privacy of someone engaged in such activity. We

think it clear that the analysis required under the closely-regulated-industry exception to

the warrant requirement must be significantly different for boarding or training kennels

than for other types of kennels that have traditionally been regulated more, and more

---

[3] The government points to Plaintiffs' allegation that CFK houses and trains some dogs for "years on end" or even their "entire lives," apparently to suggest that owners do not hold training kennels accountable. Aplee. Br. at 24 (quoting Aplt. App., Vol. I at 17) (internal quotation marks omitted). But there is at least an equally strong inference that the dog owners have great faith in Mr. Johnson's care of their pets.

[4] *See infra*, at 35 n.5.

intrusively. Thus, we limit our Fourth Amendment analysis to the industry of boarding or training kennels.

### B. Whether Boarding or Training Kennels Are Closely Regulated

Applying the above law, we cannot say that the information available on the government's motion to dismiss establishes that the boarding- or training-kennel industry qualifies for the "narrow exception" to the warrant requirement for closely regulated businesses. *Patel*, 576 U.S. at 424. After considering the history of the inspection regime, the extent of regulations on boarding or training kennels, regulation by other jurisdictions, and the risk to public welfare, we do not think we can infer at this stage of the proceedings that Plaintiffs "cannot help but be aware that [their] property will be subject to periodic inspections undertaken for specific purposes." *Burger*, 482 U.S. at 705 n.16 (internal quotation marks omitted).

To begin with, as previously noted, in conducting our analysis we do not look at the inspection provision itself, *see Patel*, 576 U.S. at 425 ("The City wisely refrains from arguing that [the ordinance including the provision authorizing warrantless inspections] itself renders hotels closely regulated."), except to note that it is of fairly recent vintage. The Act first authorized warrantless inspections of animal dealers, pounds, animal shelters, pet shops, and research facilities when the Act was passed in 1972, *see* 1972 Kan. Sess. Laws Ch. 201 § 9, and it began applying to kennels that maintained animals "for boarding or similar purposes" almost 20 years later, 1991 Kan. Sess. Laws Ch. 152 §§ 21, 22. The 33 years that boarding or training kennels have been subject to warrantless

searches is not entitled to particular weight when compared to the timeframes for industries that the Supreme Court has found closely regulated in light of historic regulation. *See Burger*, 482 U.S. at 707 ("[W]arrantless inspection provisions for junk shops have been a part of the law of the City of New York and of Brooklyn for at least 140 years."); *Colonnade Catering*, 397 U.S. at 75 (noting the "long history of the regulation of the liquor industry during pre-Fourth Amendment days"). Although the Court has indicated that history is less important when dealing with a "new or emerging" industry, like nuclear power, that poses "enormous potential safety and health problems," *Dewey*, 452 U.S. at 606; *see also Biswell*, 406 U.S. at 315 ("Federal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry, but close scrutiny of this traffic is undeniably of central importance to federal efforts to prevent violent crime . . . ."), nothing in the complaint provides reason to think that the boarding- or training-kennel industry was either new or emerging in 1991 or poses significant safety risks. Thus, the industry's lack of a long tradition of regulation is an important factor arguing against its characterization as closely regulated.

Still, "the number of regulations certainly is a factor in the determination whether a particular business is 'closely regulated.'" *Burger*, 482 U.S. at 705 n.16. The Kansas Commissioner has promulgated detailed regulations under the Act regarding the handling and care of animals. The regulations impose standards for housing, *see* K.A.R. §§ 9-18-10–9-18-13, cleaning, sanitization, and pest control, *see id.* § 9-18-14, separating certain animals, *see id.* §§ 9-18-15–9-18-16, feeding and watering, *see id.* § 9-18-17, contingency plans in the event of an emergency or natural disaster, *see id.* § 9-18-18,

Page **32**

employee supervision, *see id.* § 9-18-19, veterinary care, *see id.* § 9-18-21, exercise, *see id.* § 9-18-22, tethering animals, *see id.* § 9-18-30, and euthanizing animals, *see id.* § 9-18-31. True, "the sheer quantity of pages of statutory material is not dispositive." *Burger*, 482 U.S. at 705 n.16. *Patel* described as a "hodgepodge" the regulations that required hotels to "maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards," rejecting the proposition that they created "a comprehensive scheme of regulation that distinguishes hotels from numerous other businesses." 576 U.S. at 425. Here, in contrast, the regulations are more narrowly directed at a limited number of businesses, which tends to weigh in favor of finding that the industry is closely regulated.

As *Patel* stated, however, laws regulating an industry (such as "laws obligating inns to provide suitable lodging to all paying guests") "are not the same as laws subjecting [an industry] to warrantless searches." *Id.* at 426. The government must show more than just that it has imposed extensive regulations targeting a specific class of businesses. The issue is the extent to which the regulations necessarily require intrusion on privacy. *See Burger*, 482 U.S. at 701 (the closely-regulated-industry "doctrine is essentially defined by the pervasiveness and regularity of the federal regulation and the effect of such regulation upon an owner's expectation of privacy" (internal quotation marks omitted)). We must therefore ask whether the existence of the regulations governing training or boarding kennels clearly inform those in the industry that they will be subject to unannounced warrantless inspections. On that issue, we can find guidance in the experience of other jurisdictions, which we now examine.

**Page 33**

An industry is more likely to be considered closely regulated if the federal government or the great majority of States have adopted similar inspection regimes. *See Burger*, 482 U.S. at 705; *id.* at 698 n.11; *V-1 Oil Co. v. Wyoming Dep't of Env't Quality*, 902 F.2d 1482, 1486 (10th Cir. 1990) (upholding warrantless inspection of underground gasoline storage tanks after considering federal regulations as showing that gasoline dealers are pervasively regulated). The government relies on the federal AWA and the fact that the majority of States have statutes regulating "'either commercial breeders or kennel operators.'" Aplee. Br. at 20–21 (quoting Ann Wooster, Annotation, *State and Local Regulation of Operation of Dog Breeding and Kennel Facilities*, 77 A.L.R.6th 393 (2012), which does not cite any specific state statutes). A closer look at these statutes, however, reveals that they would not put Plaintiffs on notice that their property will be subject to unannounced warrantless inspections.

First, consider the most pervasive law on the subject, the AWA. The scope of that statute has expanded over time. Congress passed the AWA in 1966, *see* Pub. L. No. 89-544, 80 Stat. 350 (1966), to address concerns about dealers that sold (often stolen) animals to research laboratories and subjected them to inhumane conditions, and the lack of adequate care provided in the research laboratories themselves, *see* S. Rep. 89–1281 (1966) (Conf. Rep.). A 1970 amendment expanded coverage to include those who transport, buy, or sell animals for exhibition or use as pets, *see* Pub. L. No. 91-579, 84 Stat. 1560 § 3 (1970) (defining *dealer*). But it has never imposed requirements on boarding or training kennels, such as Mr. Johnson's. It therefore could hardly warn such business owners that their property will be subject to warrantless inspections.

Nor does regulation by other States suggest that boarding- or training-kennel operators are on notice that their property is subject to unannounced warrantless inspections. Although we have identified 34 States with regulatory schemes targeting pet-animal businesses, those who operate boarding or training kennels appear to be subject to unannounced warrantless inspections (beyond those for initial licensure or in response to a complaint) in only nine of those States.[5] Boarding- or training-kennel operators

---

[5] Fourteen States have regulatory regimes targeting dog breeders, sellers, or shelters but not boarding or training kennels. *See* Ark. Code Ann § 4-97-102; Del. Code. Ann. tit. 16, §§ 3042F(a)(2), (3) (*requiring* retail dog outlets to obtain a retail dog outlet license but *permitting* a person who maintains a kennel where more than four dogs are kept to obtain a kennel license), 3043F (authorizing inspections of facilities for which a license is sought or obtained); Ind. Code Ann. § 15-21-2-1; Nev. Rev. Stat. §§ 574.210–574.510 (imposing requirements on "breeders," "operators," and "retailers and dealers"), 574.290 (defining *operator* as a "cattery, kennel or commercial establishment engaged in the business of selling animals" or an animal shelter); N.H. Rev. Stat. Ann. § 437:3 (license required for pet vendors); N.Y. Agric. & Mkts. Law §§ 403 (license required for pet dealers), 421 (license required for animal shelters); Ohio Rev. Code Ann. §§ 956.04, 956.05, 956.21 (requiring high-volume breeders, dog brokers, and pet stores to obtain a license); Okla. Stat. Ann. tit. 4 § 30.4; Tenn. Comp. R. & Regs. 1200-33-01-.04; Tex. Occ. Code Ann. § 802.101(a); Vt. Stat. Ann. tit. 20, § 3681; Wash. Rev. Code Ann. § 16.52.310 (imposing requirements on persons with custody of "more than 10 dogs with intact sexual organs" but exempting boarding facilities); W. Va. Code Ann. § 19-20-26; Wis. Stat. Ann. § 173.41(2).

Three States impose regulations on boarding or training kennels but do not impose an inspection regime for these kennels. *See* Cal. Health & Safety Code §§ 122381–122385 (imposing requirements on pet-boarding facilities); *Reference – California Law: Pet Boarding Facilities, Effective January 1, 2017 (2016 SB 945, Senator William Monning)*, The Animal Council, https://www.theanimalcouncil.com/files/California_Pet_Boarding_Law_Reference_2017.pdf [https://perma.cc/42CK-DN5C] ("There is no state oversight or regulatory authority. Rather, enforcement is at the discretion of local authorities in the context of other local ordinances and state laws that may apply."); *compare* Minn. Stat. Ann §§ 346.35–346.44 (imposing requirements on animal-boarding facilities without an inspection provision), *with* Minn. Stat. Ann. §§ 347.37 (authorizing inspections of *kennels* and *dealers*), 347.31

---

(defining *kennel* as a place "whereupon dogs or cats are kept, congregated, or confined, if the dogs or cats were obtained from municipalities, pounds, auctions, or by advertising for unwanted dogs or cats, or dogs or cats strayed, abandoned, or stolen"); *compare* Or. Admin. R. 603-015-0025–603-015-0060 (imposing requirements on boarding kennels without an inspection provision), *with* Or. Admin. R. 603-015-0075–603-015-0110 (imposing requirements on animal-rescue entities including an inspection provision, Or. Admin. R. 603-015-0095).

Six States that regulate boarding or training kennels require prior notice of an inspection or permit inspection only upon initial licensing or a complaint. *See* Md. Code Ann., Crim. Law § 10-616(b) (requiring prior notice of inspections of kennels where more than 25 dogs are kept); Mich. Comp. Laws Ann. § 287.270 (authorizing initial inspection for licensure of boarding kennels); N.J. Stat Ann. §§ 4:19-15.1 (defining *kennel* to include any establishment "boarding or selling dogs or breeding dogs"), 4:19-15.8(a) (requiring kennels to obtain licenses); *Guidelines for Municipal Licensure of Animal Facilities*, New Jersey Department of Health, https://www.nj.gov/health/vph/documents/guidelines_for_municipal_licensure_of_an imal_facilities.pdf [https://perma.cc/6X5J-WW2U] ("Prior to issuance of a license, local health department staff shall inspect the facility."); N.C. Gen. Stat. §§ 19A-28 (requiring licensure for boarding kennels under animal-welfare statute), 19A-25 (authorizing inspections of all reports of violations of the statute); R.I. Gen. Laws Ann. §§ 4-19-15 (authorizing inspections for purposes of enforcing animal-care statute), 4-19-6(a) (requiring kennels to obtain a license under animal-care statute), § 4-19-2(19) (defining *kennel* to include establishments where animals are sheltered in return for a fee); 250 R.I. Code R. § 40-05-4.1 (permitting inspections for licensure or in response to a complaint); Va. Code Ann. § 3.2-6564(A) (authorizing inspections of boarding establishments upon receiving a complaint of a suspected violation).

Two States that regulate boarding or training kennels require officials to obtain consent or an administrative warrant rather than requiring businesses to consent as a condition of their license. *See* Colo. Rev. Stat. Ann. §§ 35-80-104 (requiring licensure to operate a pet-animal facility), 35-80-102(11) (defining *pet animal facility* to include a place keeping pet animals for boarding), 35-80-110(3) (authorizing access to the premises of licensees upon consent or an administrative warrant); Iowa Code §§ 162.5A (requiring boarding kennels to obtain a state license), 162.10B (permitting inspections of state licensees upon consent or an administrative warrant).

Only nine States (less than half of the States that regulate training or boarding kennels) have statutes that appear to authorize warrantless inspections without notice of boarding or training kennels beyond those for initial licensure or in response to a complaint. *See* Ariz. Rev. Stat Ann. §§ 11-1009(F) (requiring a person who operates a kennel that houses more than 20 dogs to allow inspections as a condition of receiving a permit), 11-1001(8) (defining *kennel* as an area in which a person keeps five or more dogs); Conn. Gen. Stat. Ann. §§ 22-344(g) (authorizing inspections of commercial

Page **36**

therefore could expect similar inspections in less than a fifth of the States (and Plaintiffs could expect similar inspections in only eight States, because Arizona's statute specifically excludes kennels that train hunting dogs, *see* Ariz. Rev. Stat Ann. § 11-1009(F)), far from the three-quarters of the States that had statutes authorizing the warrantless inspections upheld in *Burger*. *See* 482 U.S. at 705, 698 n.11 (citing 38 state statutes). Nor is there a long historical tradition of conducting warrantless inspections, with only three of those nine States having statutes dating before 1980.[6]

---

kennels "at any time"), 22-327(3) (defining *commercial kennel* as "a place maintained for boarding or grooming dogs or cats"); Ga. Code. Ann. §§ 4-11-9 (authorizing inspections of kennels "at any time"), 4-11-2(5) (defining *kennel* to include establishments where dogs are "maintained for boarding, holding, training, or similar purposes for a fee or compensation."); 225 Ill. Comp. Stat. Ann. 605/18 (authorizing inspections of licensees), 605/3 (requiring kennel operators to obtain licenses), 605/2 (defining *kennel operator* to include persons who operate an establishment where dogs are maintained for boarding or training); Ill. Admin Code tit. 8, § 25.100 (licensees consent to investigations at "reasonable business hours"); Me. Stat. tit. 7 § 3936(1) (authorizing inspectors to enter boarding kennels "at any reasonable time"); Mass. Gen. Laws Ann. ch. 140, §§ 137C (authorizing inspections of kennels "at any time"), 136A (defining *kennel* to include boarding or training kennels); Mo. Ann. Stat. §§ 273.331 (requiring inspections of licensees at least once a year), 273.327 (requiring boarding kennels to obtain licenses); Neb. Rev. Stat. Ann. §§ 54-628 (authorizing inspections of licensees once in a 24 month period), 54-627 (requiring boarding kennels to obtain a license); 23 Neb. Admin. Code § 006.02C (inspections may be unannounced); Pa. Stat. and Cons. Stat. §§ 459-218(a) (requiring inspections of licensed kennels at least twice per year), 459-206(a) (requiring boarding kennels to obtain licenses).

Finally, we note that three of the above-described state statutes specifically exclude kennels that train hunting dogs. *See* Ariz. Rev. Stat Ann. § 11-1009(F); Md. Code Ann., Crim. Law § 10-616(b); N.C. Gen. Stat. § 19A-39. This tends to further show that Plaintiffs could not expect that Mr. Johnson's kennel would be subject to unannounced warrantless searches.

[6] Of the nine state statutes with provisions authorizing these types of inspections, six of those provisions were enacted either after or within 10 years of when Kansas began regulating boarding or training kennels in 1991. *See* 2009 Ariz. Legis. Serv. Ch. 151 § 2; 1986 Ga. Laws Ch. 11, at 633; 1987 Me. Laws Ch. 383, at 525; 1992 Mo. Legis.

Finally, we note that Plaintiffs have alleged that "[d]og training and handling isn't an intrinsically or inherently dangerous activity" and that, unlike other businesses that house dogs, dog owners "hold trainers and handlers accountable." Aplt. App., Vol. I at 38. The government has not argued otherwise, nor could it at this stage of the proceeding in which we must take Plaintiffs' allegations as true.

In sum, the relevant factors—the history of warrantless searches in the industry, the extensiveness of the regulatory scheme, whether other jurisdictions impose similar regulatory schemes, and the inherent danger presented by the industry, *see Zadeh*, 928 F.3d at 465—do not suggest that the boarding- or training-kennel industry is closely regulated. Although Kansas has an extensive regulatory scheme that applies to boarding or training kennels, such kennels have not been closely regulated historically or by a large number of other jurisdictions and the record does not show that they are inherently dangerous. Thus, we cannot say that those who operate boarding or training kennels "cannot help but be aware that [their] property will be subject to periodic inspections

_____

Serv. S.B. 636 § 2; 2000 Neb. Laws L.B. 825 § 4; Pennsylvania Dog Law, Act of Dec. 7, 1982, P.L. 784, No. 225 § 218. Three States—Connecticut, Illinois, and Massachusetts—have imposed this type of inspection regime for decades longer than Kansas. Connecticut enacted a statute in 1931 permitting inspection "at any time" of any kennel in which dogs "are boarded for hire or kept for sale." 1931 Conn. Acts. Ch. 110, at 147. Illinois enacted a statute permitting inspections of pet-shop operators and dog dealers in 1965, 8 Ill. Comp. Stat. § 318 (1965), and included kennel operators—which it defined to include establishments where dogs are maintained for boarding or training purposes—in 1973, 8 Ill. Comp. Stat. §§ 302, 303, 318 (1973). And Massachusetts enacted a statute permitting inspections of kennels—which it defined to include dogs maintained for boarding or training purposes—in 1934. 1934 Mass. Acts Ch. 320, at 401, 403.

undertaken for specific purposes," *Burger*, 482 U.S. at 705 n.16 (internal quotation marks omitted), although we recognize that further factual development on remand may establish otherwise.

## C.    *Burger* Criteria

Even if Mr. Johnson's kennel is part of a closely regulated industry, warrantless inspections are not justified unless all three *Burger* criteria are satisfied. As set forth above, for warrantless searches of a closely regulated industry to be reasonable under the Fourth Amendment, the regulatory scheme must be informed by a substantial government interest, warrantless inspections must be necessary to further the regulatory scheme, and the warrantless inspection regime must provide a constitutionally adequate substitute for a warrant. *See Patel*, 576 U.S. at 426. We will assume that the third criterion has been satisfied[7] and focus only on the first two.

---

[7] For an inspection program to satisfy the third requirement, the law "must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. The Kansas regulations provide that an inspection "shall" be conducted every 15 to 24 months if the premises passed its three most recent inspections; every 9 to 18 months if it passed its two most recent inspections; and every 3 to 12 months if it failed either of its two most recent inspections. K.A.R. § 9-18-9(b). In addition, inspections "may" be conducted "under any of the following circumstances": (1) "A violation was found in a previous inspection." (2) "A complaint is filed regarding the premises." (3) "The ownership of the premises changed in the previous year." And (4) "The license for the premises was not renewed in a timely manner." *Id.* § 9-18-9(c). Inspections may take place only on Monday through Friday between 7:00 AM and 7:00 PM, *see id.* § 9-18-9(d), and licensees may specify their preferred times for inspection (inspectors "attempt to accommodate" these hours but "cannot guarantee" inspection during preferred hours), Aplt. App., Vol. I at 181 (licensing form asking preferred hours for inspection). Despite Plaintiffs' argument that the government's own handbook shows

Regarding the first requirement, the government argues that it has a "substantial interest in protecting animals from cruel and inhumane conditions." Aplee. Br. at 28. But concern for animal welfare is not enough. In *Burger* the Supreme Court did not stop its analysis of this requirement after stating that stolen cars are a big problem; it further noted that automobile junkyards are a significant contributor to the problem and that it was reasonable to think that regulating them would reduce theft. *See* 482 U.S. at 708–09; *see also Biswell*, 406 U.S. at 315 ("Federal regulation of the interstate traffic in firearms . . . is undeniably of central importance to federal efforts to prevent violent crime

---

that inspectors' discretion is not at all limited, the handbook gives them discretion only to choose when to conduct an inspection within the intervals set forth by K.A.R. § 9-18-9. *See* Aplt. App., Vol. I at 83 ("Inspectors may use discretion regarding the elapsed time before they return to a facility within the correlating rating inspection range schedule.").

The regulations also define the scope of searches. Inspectors are authorized to enter the place of business, examine and make copies of required records, "inspect premises and animals as . . . necessary to enforce" the Act and its regulations, document conditions and areas of noncompliance, and "use a room, table, or other facilities necessary for the examination of the records and inspection." K.A.R. § 9-18-8.

The Act therefore advises businesses when searches are made pursuant to law and are within the proper scope. And it limits officers' discretion over executing searches at least as much as the search provision that was upheld in *Burger*, which permitted inspections during "regular and usual business hours," and defined the scope of searches to include records and vehicles or vehicle parts on the premises that are subject to record-keeping requirements. *Burger*, 482 U.S. at 711–12. Also, similar to the inspection provision that was upheld in *Dewey*, it limits inspectors' discretion by requiring inspections of all licensees and defines their frequency. *See* 452 U.S. at 604. Finally, it is easily distinguishable from the inspection provision that was struck down in *Patel*, which required hotels to make their records available to any police officer for inspection on demand without imposing any limit on the officers' discretion regarding when or how frequently those inspections could occur. *See* 576 U.S. at 412.

and to assist the States in regulating the firearms traffic within their borders."). What is needed to satisfy this requirement is a substantial interest in enacting the regulations. There must be reason to think that public welfare will be damaged without government supervision of the industry at issue. In short, there must be factual support for the proposition that regulating boarding or training kennels would advance animal welfare.[8]

Here, Plaintiffs have alleged that there is no sufficient government interest justifying the regulation of boarding or training kennels, because dog training and handling is not dangerous, and training kennels are accountable to dog owners. This makes sense because the dogs that Mr. Johnson houses and trains are owned by customers who have an interest in maintaining each dog's health and would likely take their business elsewhere if their dogs were mistreated. There may be contrary evidence establishing a real need to police such kennels, but such evidence is not available on a motion to dismiss for failure to state a claim.[9]

---

[8] We recognize that courts occasionally give only perfunctory attention to this requirement. But it appears that the requirement was not disputed in those cases. For example, in *Big Cats* this court "assume[d]" that "[t]he government has a substantial interest in animal safety and welfare," which the plaintiff did not contest in that case. 843 F.3d at 866; *see also, e.g.*, *Killgore v. City of S. El Monte*, 3 F.4th 1186, 1192 (9th Cir. 2021) (stating that "there is no question that curtailing prostitution and human trafficking is a substantial government interest" without discussing how regulating massage establishments furthers that interest). And we do not foreclose the possibility that sometimes (although not in this case) the connection could be made simply by common sense.

[9] In any event, the authorities cited by the government do not show a need for regulation of the boarding- or training-kennel industry. It cites a Kansas statute that criminalizes animal cruelty but at most that law establishes a public interest in preventing animal cruelty; it applies to anyone and is not targeted at any industry in particular. *See* K.S.A. § 21-6412. Also, the government cites several cases finding government interests

Turning to the requirement that warrantless searches be necessary, the government asserts that many potential violations of the Act can be "quickly concealed." Aplee. Br. at 30. Although recognizing that the Act authorizes obtaining an administrative warrant if the business denies an inspector access to the premises, *see* K.S.A. § 47-1709(k), the government contends that this process is ineffective because "an administrative warrant may be sought only after the licensee has learned his premises are going to be inspected, giving him time to conceal violations." Aplee. Br. at 32. We are not persuaded.

The necessity of warrantless searches is not apparent from the face of the Kansas regulations. To begin with, we note that a number of violations would be very difficult to quickly correct or conceal. *See, e.g.*, K.A.R. §§ 9-18-10(a)(1) (requiring structurally

---

in regulating the handling of animals, but none deals with boarding or training kennels. *See Pro. Dog Breeders Advisory Council v. Wolff*, No. 1:CV-09-0258, 2009 WL 2948527, at *9 (M.D. Pa. Sept. 11, 2009) (dog-breeding industry); *Kerr v. Kimmell*, 740 F. Supp. 1525, 1527–29 (D. Kan. 1990) (animal breeders); *Cory v. Graybill*, 149 P. 417, 417–18 (Kan. 1915) (considering the livestock sanitary commissioner's authority to order killing of cattle that tested positive for tuberculosis); *State v. Marsh*, 823 P.2d 823, 827–28 (Kan. App. 1991) ("puppy mills").

The government did present a news article with its briefs in district court, but it related to puppy mills, not boarding kennels. In its appellate brief the government also cites an academic article about the mistreatment of hunting dogs; but the article says nothing about commercial kennels. It complains about owners who have starved or abandoned dogs that they feel they cannot afford to maintain, hardly likely clientele for a training kennel. *See* Jamie B. Walker, *Hunting a Home: The Abandonment and Neglect of Hunting Dogs*, Exigence, no. 1, 2018, art. 5. And it cites two additional news articles. One of them appears to concern a boarding kennel where two dogs were killed in a fight between them, but the report does not indicate whether the fight could have been prevented by compliance with the regulations. Finally, at oral argument the government mentioned testimony before the Kansas Senate Committee on Agriculture and Natural Resources. But this testimony was not presented in the government's briefing to this court or in its pleading before the district court. We therefore decline to review it.

sound construction), 9-18-10(d) (requiring electric power), 9-18-10(c)(1) (requiring surfaces made of materials that can be readily cleaned and sanitized), 9-18-13(d)(1)(A) (requiring minimum floor space per dog), 9-18-14(c) (requiring management of "pests or potential hazards so as to promote the health and well-being of the animals"), and 9-18-17(a)(1) (ensuring that animals are fed "as appropriate to species and age"). And others would be very hard to establish even in a surprise inspection, such as the requirements that dogs be fed daily, *see id.* § 9-18-17(a)(1), and not be tethered for more than two hours at a time or more than four hours total per day, *see id.* § 9-18-30. Even if food is not out when the inspector arrives, how can the inspector know that the dogs were not fed earlier? Similarly, if a dog is tethered when the inspector arrives, the inspector would not know how long the dog had been tethered.

To be sure, violations of some requirements could be more readily detected through surprise inspections—such as requirements that licensees must regularly clean all enclosures, food and water receptacles, and surfaces with which animals come into contact, *see id.* § 9-18-14, provide a sufficient number of food receptacles, and make sanitary drinking water accessible, *see id.* § 9-18-17. But if these violations are significant and chronic—the sort of abuse the law is most concerned about—remedying them is likely not possible during the time it would take to get a warrant and the effects on the dogs would be readily apparent. Inspectors could likely detect violations just by looking at the condition of the dogs. Perhaps the kennel operator could "dispose of" a sick or injured dog. But that would be much harder for an operator to do when the dogs are owned by customers than if the business was that of a dog breeder or a pet shop. The

**Page 43**

government has not undermined Plaintiffs' allegation that "there is little risk that significant alleged violations could be corrected during the time interval between an inspector's initial request to search and procuring a warrant—a mistreated dog doesn't quickly recover, for example." Aplt. App., Vol. I at 38.

Moreover, to establish that warrantless searches are necessary, the government needs to show more than just that violations *could* be concealed in the time it takes to obtain a warrant after a business refuses the inspection. It needs evidence from practice that the regulations could be effectively enforced only through a regime that relies on surprise warrantless inspections. In both *Barlow's*, 436 U.S. at 316–20, and *Patel*, 576 U.S. at 427, the Supreme Court placed the burden on the government to show that *ex parte* warrants cannot adequately catch violations by uncooperative licensees or that the frequency of owners refusing to consent to inspection would make it unfeasible to obtain the number of *ex parte* warrants necessary to deal with such licensees. *See also Free Speech Coal.*, 825 F.3d at 153–54, 172 (concluding that warrantless inspections of records required to be kept by producers of sexually explicit materials were unnecessary in light of testimony from FBI agents that it is unlikely a producer could assemble the records on short notice and evidence that one third of inspections had been conducted after providing prior notice without any reports of fabrication); *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 290 (6th Cir. 2018) (concluding that warrantless inspections of "[a]ll books, forms, and records" kept by precious-metal dealers were unnecessary in light of testimony by the State's chief examiner that only one dealer in three years had

refused an inspector's request to look at records). The record before us does not establish a need for warrantless inspection.

In short, dismissal of Plaintiffs' Fourth Amendment claim was improper because Plaintiffs' complaint (unsurprisingly) does not establish that the closely-regulated-industry exception applies and the *Burger* factors are satisfied. This conclusion also requires reversal of the dismissal of Plaintiffs' claim that the Kansas Pet Animal Act unconstitutionally conditions issuance of a license on waiving Fourth Amendment rights. The government does not dispute that dismissal of Plaintiffs' unconstitutional-conditions claim cannot be affirmed unless dismissal of their Fourth Amendment claim was proper. Its argument was only that there had been no Fourth Amendment violation. *See* Aplee. Br. at 45 ("If no constitutional rights have been jeopardized, no claim for unconstitutional conditions can be sustained." (brackets and internal quotation marks omitted)); 5 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 10.2(c), at 60 (6th ed. 2022) ("[T]he right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." (internal quotation marks omitted)).

## III.    RIGHT TO TRAVEL

The Act provides that the failure of an owner or licensee, or a designated representative, to make the premises available for inspection within 30 minutes of the inspector's arrival results in a $200 no-contact fee. *See* K.S.A. § 47-1721(d)(1). Plaintiffs challenge the district court's dismissal of their claim that this provision violates their

fundamental right to travel because they cannot travel more than 30 minutes from the homestead together without risking the fee.

Mr. Johnson regularly travels "throughout the Midwest, and sometimes beyond" to attend competitive events for dogs. Aplt. App., Vol. I at 18. Ms. Hoyt sometimes accompanies him on these trips. When Plaintiffs are both gone at the same time, Mr. Johnson has someone assist with caretaking responsibilities at the homestead. K.A.R. § 9-18-9(e) provides that if an owner or operator is not routinely available during the permissible hours of inspection, he shall designate a representative to be present during an inspection. Mr. Johnson has chosen to designate only Ms. Hoyt as his representative because he "doesn't want the people who help him with the dogs to interact with government inspectors on his behalf." Aplt. App., Vol. I at 32.

The "constitutional right to travel from one State to another is firmly embedded in our jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (internal quotation marks omitted). Its protections include "the right of a citizen of one State to enter and to leave another State." *Id.* at 500. Plaintiffs assert their claim under the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses. But because of the "unquestioned historic acceptance of the principle of free interstate migration," the Supreme Court has "not felt impelled" to locate it "definitively in any particular constitutional provision." *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986). We therefore reject Plaintiffs' argument that the two clauses require distinct analysis and that the government waived any objection to their Privileges or Immunities claim by not mentioning that clause in its motion to dismiss. *See Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1118 n.2 (10th Cir.

Page **46**

2021) (per curiam), *cert. denied*, 142 S. Ct. 1123 (2022) ("The textual source of the right of interstate travel is not material here. For our purposes, it is sufficient that the right is 'fundamental,' and restrictions on it are subject to strict scrutiny." (citations omitted)).

The right to interstate travel is "not unlimited." *Abdi v. Wray*, 942 F.3d 1019, 1029 (10th Cir. 2019). "[G]overnment conduct that does not directly and substantially 'impair the exercise of the right to free interstate movement' does not amount to a constitutional violation." *Id.* at 1030 (quoting *Saenz*, 526 U.S. at 501). In *Abdi* a citizen's placement on the Selectee List subjected him to enhanced security screening at airports. Even though this imposed a burden on him and on one occasion prevented him from boarding a plane, resulting in a two-day delay in his travel, his constitutional rights were not violated. *See id.* at 1023, 1030–31. We explained that he had "not alleged that his delays substantially exceed those experienced by many air travelers nor preclude his ability to travel." *Id.* at 1031.

Here, the regulations do not impose burdens beyond those commonly borne by owners of businesses who travel away from the locations of their businesses. If the owner leaves the business unattended, the business may lose potential customers who stop by to inquire about the products or services offered, may miss deliveries of essential products, and may not be able to deal adequately with unexpected misfortune, such as fire, flood, or security breaches. Plaintiffs complain that Mr. Johnson prefers not to designate a representative other than Ms. Hoyt to allow government inspections; but the consequences of his refusal to designate an agent are not different in kind from those that

would result if he declined to hire someone to take care of his business or property in his absence. There is nothing special about the resulting burden on his interest in traveling.[10]

Finally, Plaintiffs contend that they have a fundamental right to *intra*state travel as well. We think the above analysis would dispose of that claim just as it disposes of their *inter*state-travel claim. *See Maehr*, 5 F.4th at 1117 (the direct-and-substantial-impairment test is applied to any claim that legislative action denies substantive due process). But in any event this court has held that "the fundamental right to freedom of movement applies only to <u>interstate</u> travel." *McCraw v. City of Okla. City*, 973 F.3d 1057, 1081 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 1738 (2021) (brackets and internal quotation marks omitted); *see also D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768, 776 (10th Cir. 2010) ("[T]he constitutional rights at issue apply only to *interstate* travel, and the travel that Plaintiffs claim was restricted was *intrastate* travel.").

## IV.    CONCLUSION

We **REVERSE** the judgment below as to Plaintiffs' Fourth Amendment and Fourth Amendment unconstitutional-conditions claims. We **AFFIRM** the dismissal of Plaintiffs' right-to-travel claim.

---

[10] Plaintiffs argue that requiring Mr. Johnson to designate a representative interferes with their right to exclude others from their homestead. They invoke *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021), in which the Supreme Court held that a state regulation granting union organizers the right to access an agricultural employer's property for up to three hours per day, 120 days per year was a physical taking. But nothing in the Kansas statute limits Plaintiffs' right to exclude nongovernmental personnel from their homestead because Mr. Johnson is permitted to designate anybody who is 18 years or older and "mentally and physically capable of representing the licensee in the inspection process." K.A.R. § 9-18-9(e). The proposed analogy to *Cedar Point* strikes us as flawed; but in any event Plaintiffs have not raised a taking claim.