# United States Court of Appeals
## For the First Circuit

No. 25-1007

FRANK THOMPSON,

Plaintiff, Appellant,

JOEL STROUT; JASON LORD; CHRISTOPHER SMITH; JACK CUNNINGHAM,

Plaintiffs,

v.

CARL WILSON, in their official capacity as Commissioner, Maine
Department of Marine Resources,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Montecalvo, Thompson, and Aframe,
Circuit Judges.

Edward M. Wenger, with whom Caleb Acker and Holtzman Vogel
Baran Torchinsky & Josefiak PLLC, were on brief, for appellant.

Valerie A. Wright, Assistant Attorney General, with whom
Aaron M. Frey, Attorney General, Thomas A. Knowlton, Deputy
Attorney General, and Jack Dafoe, Assistant Attorney General, were
on brief, for appellee.

Sean H. Donahue, with whom David T. Goldberg, Donahue, Goldberg & Herzog, Russell B. Pierce, Jr., and Norman Hanson DeTroy, LLC, were on brief, for Atlantic States Marine Fisheries Commission, amicus curiae.

Andrew C. Mergen, Sommer H. Engels, Rosa Hayes, Shannon Nelson, Aaron Kleiner, Riley Pfaff, Spencer Weisner, and Emmett Environmental Law & Policy Clinic, Harvard Law School, on brief for Environmental and Marine Law Scholars, amicus curiae.

Erica A. Fuller, Chloe C. Fross, Sarah Shahabi, and Conservation Law Foundation, on brief for Conservation Law Foundation and Ocean Conservancy, amicus curiae.

---

November 18, 2025

---

THOMPSON, **Circuit Judge**. According to New England legend, Maine law once restricted the amount of lobster that could be fed to prisoners before it was considered cruel and unusual punishment. Our Nation's perspective on these succulent crustaceans has certainly changed since those early colonial days, but laws related to the American Lobster remain on Maine's books today. Such is the topic of the present appeal: a Maine Department of Marine Resources ("MDMR") Rule that requires all Maine lobstermen[1] who hold federal lobster fishing permits to install an electronic tracking device on their vessels and share their location data whenever those vessels are in the water.

After the MDMR Rule went into effect, appellant Frank Thompson and a group of Maine lobstermen filed suit in the United States District Court for the District of Maine seeking to enjoin the MDMR Rule and have it declared unconstitutional as per the Fourth Amendment's unreasonable searches and seizures prohibition. Following a motion to dismiss from the Commissioner of the MDMR (whom we will refer to in this opinion generally as "Maine"), the district court held that the lobstermen had failed to state a claim for which relief could be granted. However, before dismissing

_____

[1] Just as the district court's opinion and the parties' briefing, we note "lobstermen" is a gender-neutral term. See Maine Lobster Community Alliance, A Lobstermen is a Lobstermen, Regardless of Gender, (July 7, 2023) https://www.mlcalliance.org/post/a-lobsterman-is-a-lobsterman-regardless-of-gender, [https://perma.cc/8DHC-V49M].

Thompson and the lobstermen's claim, the district court encouraged them to appeal their Fourth Amendment challenge to our court for an authoritative ruling.  They did, and we respond to this request head on.  In doing so, we affirm the district court's dismissal.

## I

Because this appeal follows a motion to dismiss, we will pull our facts from Thompsons's complaint, draw all reasonable inferences in Thompson's favor, and consider any materials fairly incorporated in the complaint or otherwise subject to judicial notice (namely the MDMR Rule we have looked up for ourselves). See, e.g., Lowe v. Mills, 68 F.4th 706, 711, 713-14 (1st Cir. 2023).

### (A)

Our system of dual federalism has established a complex and shared regime of federal and state law to ensure the protection and continuous vitality of the Nation's fisheries.[2]  Along the Atlantic coast, individual states like Maine regulate the fishery happenings within three nautical miles of their shores, while the National Marine Fisheries Service (a sub-agency of the National Oceanic and Atmospheric Administration) handles waters extending

---

[2] While we only recap the statutes and regulations essential to our analysis, the district court provided an in-depth summary of the entire statutory and regulatory backdrop for the MDMR Rule, which the curious reader may access. See Thompson v. Keliher, No. 1:24-cv-00001, 2024 WL 4851243, at *2-9 (D. Me. Nov. 21, 2024).

200 nautical miles from the outer boundary of state waters (an area known as the exclusive economic zone or "EEZ"). See generally Me. Stat. tit 12, § 6001(6); 16 U.S.C. §§ 1801(b), 1802(11).

Fish (often along with their pursuers) tend to freely move about the open ocean, making regulation subject to clearly marked boundaries often impracticable. That said, protection of these aquatic resources remains crucial. To help combat this natural fish-shifting dilemma, fifteen states and the District of Columbia exercise joint regulatory authority through the Atlantic States Marine Fisheries Commission ("ASMFC" or the "Commission"). See generally 16 U.S.C. §§ 5101, 5102(3). Federal law encourages the Commission to draft and adopt fishery management plans ("FMPs") that specify actions to be taken by member states to protect coastal fishery resources. See generally id. §§ 5102(1), 5104(a)(1). Once an FMP is promulgated, federal law then requires member states to "implement and enforce" it. Id. § 5104(b)(1); see generally R.I. Fishermen's All., Inc. v. R.I. Dep't of Env't Mgmt., 585 F.3d 42, 46 (1st Cir. 2009) (outlining the history of the Commission and its shift to compulsory FMPs). In the state of Maine (an ASMFC member state), the MDMR regulates

state waters subject to the Commission's FMPs.  See Me. Stat. tit. 12, §§ 4651-56.[3]

So, to summarize what we've covered thus far, the Commission creates an FMP to preserve fishery resources, and the MDMR promulgates rules to adopt and enforce, at a minimum, the requirements of the FMP.  See Medeiros v. Vincent, 431 F.3d 25, 27-28 (1st Cir. 2005) (abrogated on other grounds) (describing the relationship between the Commission and state regulators in the context of the American Lobster FMP); see also 50 C.F.R. § 697.3(c) (requiring a federal lobster fishing license holder to adhere to the more restrictive regulation where different).  With this backdrop in place, we can start narrowing down to the specifics of this case.

In March 2022, the Commission published an addendum to its existing American Lobster FMP entitled "Addendum XXIX to Amendment 3 to the American Lobster Fishery Plan; Addendum IV to the Jonah Crab Fishery Management Plan."  The Addendum's primary purpose is to reduce the risk of North Atlantic right whales from getting entangled in fishing lines.  In addition to protecting the right whales, the Addendum seeks to: (1) improve information available to fishery managers and stock assessment scientists;

_____

[3]  Maine participates in the ASMFC through three representatives, one being the active MDMR Commissioner. Me. Stat. tit. 12, § 4652.

- 6 -

(2) support the development of offshore renewable energy in U.S. waters; and (3) improve the efficiency and efficacy of fishery management and offshore enforcement efforts in the EEZ.

To pursue these goals, the Addendum requires member states to promulgate rules requiring federally permitted lobstermen to install electronic tracking devices that transmit location data using a global positioning system ("GPS") on board their vessels by December 15, 2023. The required tracking devices must remain powered and transmit data at all times the vessel is in the water, including when a vessel is docked or being operated for personal use. The Addendum further specifies that compliant tracking devices must have a "ping rate" of once per minute, meaning that the tracker will collect data on a vessel's longitude and latitude once every minute. Maine timely complied with Addendum XXIX by promulgating the MDMR Rule on September 13, 2023. 13-188 C.M.R. ch. 25, § 98 (2023).

The MDMR Rule adheres to the requirements of the Commission's Addendum and makes some additions. In essence, those additions make it unlawful for a federally permitted lobstermen to fish or possess lobsters without having an approved tracking device aboard their vessel; to remove or tamper with the tracking device absent approval from the MDMR; and to operate their vessel without the tracking device installed and powered at all times (with different power source requirements for vessels in operation

compared to docked).  See id. § 98(C).[4]  In November 2023, the MDMR began sending permitted lobstermen Particle TrackerOne devices to comply with the MDMR Rule.[5]

**(B)**

The original plaintiffs in this case -- Thompson and several Maine lobstermen subject to the MDMR Rule[6] -- filed a federal suit against the Commissioner of the MDMR in his official capacity, which challenged the adoption and enforcement of the MDMR Rule on three grounds.[7]  First, they alleged the MDMR Rule violated the Fourth Amendment's prohibition on unreasonable searches and seizures, as applied to the states by the Fourteenth Amendment.  Second, they claimed the MDMR Rule violated their equal protection rights pursuant to the U.S. Constitution and the Maine Constitution.  And third, they alleged the MDMR Rule was arbitrary

---

[4] The MDMR Rule does not list any specific punishments for failure to comply with its requirements.  Before the district court, Maine stated that violations of the MDMR Rule are treated like any other violation of an MDMR regulation with the possibility of a civil fine of not less than $100 and the suspension of the individual's license.  Thompson's appellate arguments do not draw on these potential penalties.

[5] The MDMR presumably selected these tracking devices because they comply with the Addendum's standards and transmit GPS location data at a ping rate of once per minute.

[6] Only Thompson has appealed to our court.

[7] The named party in this appeal, Commissioner Wilson, has been substituted for the previously named party, Patrick Keliher, who held the office of MDMR Commissioner during the district court proceedings.

and capricious contrary to the protections of the Maine Administrative Procedure Act.[8]  Not long after the lobstermen filed their complaint, Maine moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The district court heard argument from the parties on this motion and subsequently entered a remarkably thorough decision wherein the court granted Maine's motion in full.

In granting Maine's motion, in relation to Thompson's Fourth Amendment challenge, the district court specifically held that the MDMR Rule was not "gratuitously invasive of lobstermen's personal privacy" and therefore plaintiffs had not sufficiently stated a claim for relief under existing Fourth Amendment jurisprudence.  To reach this resolution, the court first made note of four concessions from the parties that narrowed the scope of its analysis.  We rehash these concessions here as they will help narrow the scope of our appellate review.  First, Maine conceded that the GPS tracking requirement of the MDMR Rule constituted a search under the Fourth Amendment.  Second, the lobstermen implicitly conceded (and then confirmed their position at oral argument before the district court) that the lobster fishery constitutes a closely-regulated industry per our

---

[8] Only Thompson's Fourth Amendment claim has been presented on appeal.  Accordingly, we focus our attention there and say no more about the other claims.

understanding of the Fourth Amendment's scope.[9]  Third, the parties agreed in their papers before the district court that the MDMR Rule constitutes an "administrative search" under the Fourth Amendment.  And fourth, the parties agreed that the MDMR has a substantial interest in regulating the lobster fishery and ensuring its long-term viability (an agreement that satisfies one prong of the legal test we will be discussing at length and applying).

We will return to these concessions in a moment, but for now, we are sufficiently enlightened as to what happened below to start unpacking Thompson's appellate contentions.

**II**

Before going any further (and before using any more Fourth Amendment lingo), here's a Fourth Amendment backdrop to set the scene.

The Fourth Amendment protects us from "unreasonable searches and seizures."  U.S. Const. amend. IV.  The same amendment also provides that "no Warrants shall issue, but upon probable cause."  Id.  Building from these constitutional provisions, the Supreme Court has "repeatedly held that searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few

---

[9] Thompson seeks to repudiate this concession on appeal, a matter to be discussed, and rejected, later on.

specifically established and well-delineated exceptions." City of Los Angeles v. Patel, 576 U.S. 409, 419 (2015) (citation modified). And it is well recognized that this general rule covers searches of homes and commercial premises. E.g., id. at 419-20; Marshall v. Barlow's, Inc., 436 U.S. 307, 312 (1978); see also Johnson v. Smith, 104 F.4th 153, 158 (10th Cir. 2024) ("[F]or more than 50 years the Supreme Court has recognized that regulatory inspections are also constrained by [the Fourth] Amendment.").

A bit more on the "well-delineated" exceptions. While "reasonableness" remains our North Star, see, e.g., Rivera-Corraliza v. Morales, 794 F.3d 208, 215-16 (1st Cir. 2015), "search regimes where no warrant is ever required may be reasonable where special needs make the warrant and probable-cause requirement impracticable, and where the primary purpose of the searches is distinguishable from the general interest in crime control," Patel, 576 U.S. at 420 (citation modified). This type of warrantless-yet-reasonable regime can arise in administrative searches of closely-regulated industries.[10] See Rivera-Corraliza,

---

[10] This exception is more accurately described as an exception within an exception to the Fourth Amendment's warrant requirement. Searches that serve a "special need" other than aiding criminal investigations have been categorized as "administrative searches." See Patel, 576 U.S. at 420. These searches may skirt the general warrant requirement so long as the subject of the search "be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." Id. Within this category are administrative searches of closely-regulated industries, which we examine under a different, "more relaxed standard." Id. at 424.

794 F.3d at 216. The justification? Because "'when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation,' and thus a warrantless search to enforce that regulatory regime is not unreasonable." Id. (quoting Marshall, 436 U.S. at 313).

Lest this potentially pervasive exception swallow the rule, it is cabined by a three-pronged test that serves as a "carefully-drawn screen" for upholding the Fourth Amendment's promised protections. See Rivera-Corraliza, 794 F.3d at 217. So, even in the context of a search within a closely-regulated industry, three things must be true to justify the search. There must be: (1) "a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." Patel, 576 U.S. at 426 (citation modified). We (the royal "we" as we're speaking for the legal community) refer to these three criteria as the Burger test. E.g., Rivera-Corraliza, 794 F.3d at 217; see also New York v. Burger, 482 U.S. 691, 702-03 (1987). And only by satisfying the requirements of the Burger test may we

- 12 -

find an administrative search of a closely-regulated industry reasonable under the Fourth Amendment.

## III

We review a district court's dismissal of a complaint under Rule 12(b)(6) de novo. E.g., Lowe, 68 F.4th at 713. This means we will be giving Thompson's claims a completely fresh look to see whether his complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Douglas v. Hirshon, 63 F.4th 49, 55 (1st Cir. 2023)).

Thompson submits three arguments on appeal for why he thinks the district court erred in throwing out his Fourth Amendment claim. First, he suggests that the MDMR Rule constitutes an unreasonable search outside of, and regardless of, any constitutional exception for warrantless searches. Second, Thompson argues the MDMR Rule "flunks" the requirements of the Burger test for administrative searches of closely-regulated industries. And third, contrary to his position below, Thompson claims here that lobstering is not a closely-regulated industry and therefore the Burger test is wholly inapplicable. We will get to each argument; however, due to its impact on the other claims, we begin with Thompson's third argument fighting against the current of his previous district court concession.

- 13 -

**(A)**

Thompson makes no attempt to hide his previous concession that lobstering is a closely-regulated industry, which dictates the specific legal test applicable to his Fourth Amendment claim. On appeal, in explaining why we should not hold him to his prior position, Thompson asks us to apply a "narrowly configured and sparingly dispensed" exception to this circuit's standard raise-or-waive rule to his previously conceded claim. See Reyes-Colón v. United States, 974 F.3d 56, 62 (1st Cir. 2020) (quoting Daigle v. Me. Med. Ctr., Inc., 14 F.3d 684, 688 (1st Cir. 1994)). Thompson standardizes the test for considering issues previously conceded but deserving of reconsideration into four parts: (1) "the new issue is strictly a question of law"; (2) "it is almost certain to be presented in identical terms in other cases"; (3) "the point can be resolved with certitude on the existing record"; and (4) the argument "raises an issue of constitutional magnitude which, if meritorious, could substantially affect these, and future," litigants. See United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990) (citation modified).[11]

---

[11] Thompson's test accurately reflects the facts important to the La Guardia court's analysis; however, we have previously expressed interest in other factors when exercising our discretion to examine issues first raised on appeal. Specifically, on top of the factors Thompson names, we've reserved this discretionary authority for "exceptional cases" where the party seeking review

- 14 -

For its part, Maine staunchly opposes its opponent's attempt to revive this issue. Maine first notes that Thompson's cited precedent for this argument refers to a narrow exception to our raise-or-waive rule inapplicable to issues specifically conceded. And where, as here, a party has specifically conceded an issue, our court has repeatedly rejected a litigant's "attempt to repudiate that concession and resurrect the issue." Baker v. Smith & Wesson, Inc., 40 F.4th 43, 45 n.1 (1st Cir. 2022) (quoting United States v. Miranda-Carmona, 999 F.3d 762, 767 (1st Cir. 2021)). Were we to disagree with its first contention, Maine also argues that our exception to the raise-or-waive rule requires that the "error is plain and the equities heavily preponderate in favor of correcting it." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995). Here (according to Maine), Thompson cannot establish plain error because his argument requires us to make a series of legal and factual determinations on issues we have not yet considered.

We decline Thompson's invitation to throw a lifeline out to this argument. Even if we were to agree with Thompson that the

---

makes a "highly persuasive" argument such that "failure to reach it would threaten a miscarriage of justice" implicating "matters of great public moment," and the failure to raise below was "inadvertent and provided no tactical advantage." See, e.g., In re Net-Velázquez, 625 F.3d 34, 40-41 (1st Cir. 2010); Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627-29 (1st Cir. 1995); United States v. Krynicki, 689 F.2d 289, 291-92 (1st Cir. 1982).

boundary between our raise-or-waive rule and our rule regarding concession is a distinction without a difference, see Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 455 (1st Cir. 2016), we disagree that the present situation amounts to such extraordinary circumstances warranting the application of our seldom-seen exception, see id.; see also Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627-29 (1st Cir. 1995); United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992) (requiring a "previously omitted ground [be] so compelling as virtually to insure appellant's success" (citation modified)). So, despite Thompson's adjuration, the fact of the matter remains that our court denies with near religious fervor a party's attempt to repudiate its concession on appeal. See Alaniz v. Bay Promo, LLC, 143 F.4th 18, 30 (1st Cir. 2025) (declining to sanction the tactic of "agreeable acquiescence to perceivable error as a weapon of appellate advocacy" (quoting United States v. Gates, 709 F.3d 58, 63 (1st Cir. 2013))). Such is the fate of the issue at hand, and therefore, we proceed, as the district court did, with the understanding that lobstering is a closely-regulated industry.

### (B)

We next address Thompson's appellate asseveration focused on the stand-alone reasonableness of the MDMR Rule. His position expands from two premises: first, as he puts it, "[t]he Burger exception is *not* an exception to the Fourth Amendment's

- 16 -

reasonableness requirement," and second, the government must prove its search is reasonable per that term's original meaning. If we were to agree with these two premises, Thompson then asks that we conclude the MDMR Rule lacks a historical analogue (or even better, that it is the modern reincarnation of the British writs of assistance that fueled the American Revolution)[12] and is therefore unreasonable in violation of the Fourth Amendment. For reasons forthcoming, we find that Thompson's first premise misunderstands our binding precedent, and as such, we need not consider his second premise to reject his contention outright.

Thompson pulls his first premise -- that the Burger test cannot save unreasonable searches of closely-regulated industries -- from general Fourth Amendment principles and his reading of our recent administrative-search opinion. To Thompson, the overbearing nature of the MDMR Rule is per se unreasonable -- particularly in its monitoring of activity beyond fishing -- such that any analysis cabined within the Burger test exception would impermissibly overlook the broad protections afforded by the Fourth Amendment.

Maine's immediate response is that this issue was not raised to the district court, and as a result, should be deemed

---

[12] See Carpenter v. United States, 585 U.S. 296, 303-04 (2018), for John Adams's recollection of how patriotic condemnation of the writs of assistance "helped spark the Revolution itself."

unpreserved on appeal. And if we find otherwise, Maine says that Thompson's argument is "just plain wrong" because searches that satisfy the Burger test are deemed reasonable within the meaning of the Fourth Amendment. Because Thompson's claim may be swiftly settled on the merits (and we think he did just enough to preserve this issue below), we decline to tackle Maine's preservation argument and proceed.

The Supreme Court has consistently framed the Burger test as the relevant (and complete) metric of Fourth Amendment reasonableness in cases involving administrative searches within closely-regulated industries. Starting with Burger itself (as good a place as any), the Court explained that "[b]ecause the owner or operator of a commercial premises in a 'closely regulated' industry has a reduced expectation of privacy . . . a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." Burger, 482 U.S. at 702. To continue, "[t]his warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met." Id. (emphasis ours).[13]

---

[13] To remind the reader of the test criteria: (1) "a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally

- 18 -

Decades after the Burger Court clarified the three criteria for finding searches of this particular ilk reasonable, the Court again applied these criteria to determine whether a Los Angeles municipal scheme permitting searches of hotel registries was unreasonable under the Fourth Amendment. See Patel, 576 U.S. at 426-27. We will discuss the details of that case shortly, but for now, and for the purposes of the present analysis, we emphasize that the Court began its inquiry by stating that the searches at issue "would need to satisfy three additional criteria to be reasonable under the Fourth Amendment." Id. at 426 (emphasis added). Hence, a satisfactory passing of the Burger test stands in as proxy for "the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search." Burger, 482 U.S. at 702.

In our review, no court has concluded differently. After applying the Burger test to a regulatory scheme involving searches of commercial trucks, we previously held that "[s]ince all three of the Burger criteria [had been] satisfied, it follows inexorably that an administrative search of a commercial truck is constitutionally permissible." United States v. Maldonado, 356 F.3d 130, 136 (1st Cir. 2004); see also Tart v. Massachusetts, 949 F.2d 490, 498 (1st Cir. 1991) (explaining that "a warrantless

_____

adequate substitute for a warrant." Patel, 576 U.S. at 426 (citation modified).

inspection in a 'closely-regulated' industry, pursuant to statute, is valid" if it satisfies the Burger test); Killgore v. City of South El Monte, 3 F.4th 1186, 1192 (9th Cir. 2021) ("Under Burger, a warrantless inspection of a commercial business in a 'closely regulated' industry is reasonable under the Fourth Amendment provided three conditions are met . . . ."). And when our sister circuit upheld a Department of Transportation regulation requiring commercial vehicles to install electronic logging devices, it used the Burger test and referred to it as "a three-part reasonableness test." Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp., 840 F.3d 879, 895 (7th Cir. 2016). Despite Thompson's suggestion otherwise, nowhere in the caselaw do we find a stand-alone reasonableness inquiry conducted in addition to the Burger test.

Thompson's attempts to persuade us differently flounder. In his efforts to divorce the Fourth Amendment's reasonableness standard from the Burger test, Thompson says that even if an exception applies, this court "must still, no matter what, 'balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.'" (quoting Maryland v. King, 569 U.S. 435, 448 (2013)). In the case Thompson cites for this proposition -- Maryland v. King -- the Court considered the reasonableness of minimally invasive buccal swabs on detained individuals. 569 U.S. at 463-64. And with that important (but

largely unrelated) question on the table, the Court did not have occasion to weigh in on whether a search may be unreasonable regardless of the Burger test.[14]

Regardless, Thompson's proposed balancing overlooks the narrow context in which the Burger test comes into play. Closely-regulated industries "have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." Patel, 576 U.S. at 424 (citation modified). As we explained earlier, this diminished expectation of privacy exists because individuals entering closely-regulated industries subject themselves to a "full arsenal of governmental regulation." Rivera-Corraliza, 794 F.3d at 216 (quoting Marshall, 436 U.S. at 313). Because the Burger test applies to searches of closely-regulated industries, which necessarily have a reduced expectation of privacy, see Burger, 482 U.S. at 702, the privacy concerns and judicial balancing Thompson requests come pre-baked into the Burger test, and need not be repeated outside of its application.

---

[14] The Court did mention searches of closely-regulated industries in passing to emphasize that "[t]he reasonableness of any search must be considered in the context of the person's legitimate expectations of privacy." See King, 569 U.S. at 462. The Court used searches of closely-regulated industries as an example of "a context-specific benchmark inapplicable to the public at large" because "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively." Id. (quoting Skinner v. Ry. Lab. Execs. Ass'n, 489 U.S. 602, 627 (1989)).

We also disagree with Thompson's interpretation of Rivera-Corraliza and take a moment here to clarify any residual doubt. In Rivera-Corraliza, we prefaced our discussion of the Burger test and exceptions to the Fourth Amendment's guarantees by stating that "[j]udges must never forget that while the Constitution okays warrantless searches in some situations, it never okays unreasonable ones." 794 F.3d at 217. Thompson reads these words of caution to mean that some searches are so far beyond the Fourth Amendment pale that an exception to the warrant requirement cannot save them.

First, the language of a judicial opinion is not always intended to be scrutinized as if it were the text of a statute. See, e.g., Brown v. Davenport, 596 U.S. 118, 141 (2022). And when read in context, this sentence from Rivera-Corraliza remains consistent with the Fourth Amendment principles we've just expounded. In the sentence immediately following the one Thompson sets his sights on, we described the Burger test as the "carefully-drawn screen" against unreasonable searches which judges must "jealously protect, lest this particular warrantless-search exception destroy the Fourth Amendment." Rivera-Corraliza, 794 F.3d at 217. A court applying the Burger test has not forgotten the Constitution's prohibition against unreasonable searches. It is indeed through the application of

- 22 -

that test that a court may conclude that an administrative search of a closely-regulated industry is reasonable.

In sum, we reject Thompson's proposition that in the context of a search of a closely-regulated industry, a free-standing reasonableness inquiry must be conducted apart from the application of the Burger test, and we now proceed to review Thompson's challenge pursuant to that test of reasonableness.

**(C)**

For the main event, Thompson argues that the MDMR Rule flunks the Burger test, particularly considering how this test has been narrowed by the Supreme Court's decision in Patel. To (again) remind the reader, the Burger test consists of three criteria: "(1) There must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." Patel, 576 U.S. at 426 (citation modified). Like before, at the district court, the parties agree that the MDMR Rule satisfies the first Burger criterion: Maine has a substantial interest in regulating and conserving its lobster fishery. Therefore, we're left with the second and third Burger criteria on our plate and discuss each in turn.

**(1)**

The second Burger criterion requires warrantless searches be necessary to further the regulatory scheme, typically because the element of surprise is crucial. Burger, 482 U.S. at 710; Rivera-Corraliza, 794 F.3d at 220. Thompson's argument harps on the term "necessary," and posits that Patel has elevated this prong of the Burger test to something "like strict scrutiny or [a] least-restrictive-means test" for the method of search being imposed. In support, Thompson points to Justice Scalia's dissenting opinion in Patel, where he described the majority's approach as "importing a least-restrictive-means test into Burger's Fourth Amendment framework . . . ." Patel, 576 U.S. at 438 (Scalia, J., dissenting). To apply Thompson's version of the heightened second Burger prong, we would need to ask whether the government's interest would be "fatally undermine[d]" in the absence of the challenged regulation. So, because Maine's conservation and sustainability interests in its lobster fishery would not be "completely defeated" without the MDMR Rule, Thompson concludes the Rule fails the Burger test at prong two.

While we have previously described the second Burger criterion in less demanding terms, see Rivera-Corraliza, 794 F.3d at 216 ("The [second criterion] is that warrantless inspections further [the substantial government] interest."), in practically the same breath, we declined to decide one way or another whether

<u>Patel</u> had changed the <u>Burger</u> test in any way, <u>see</u> <u>id.</u> at 217 n.12. For reasons we are about to unpack, we do not believe <u>Patel</u> has elevated the scrutiny owed at the second <u>Burger</u> criterion as Thompson suggests.[15]

In <u>Patel</u>, the Court reviewed a facial challenge to a provision of the Los Angeles Municipal Code that, in relevant part, required hotel operators to produce detailed records of their guests to any Los Angeles police officer immediately upon request. 576 U.S. at 412-13. The Court began its Fourth Amendment review by first acknowledging that government searches conducted without a warrant, or otherwise conducted without prior approval by a judge, are "*per se* unreasonable" under the Fourth Amendment. <u>Id.</u> at 419 (quoting <u>Arizona</u> v. <u>Gant</u>, 556 U.S. 332, 338 (2009)). However, the Court continued that "[s]earch regimes where no warrant is ever required may be reasonable where special needs make the warrant and probable-cause requirement impracticable, and where the primary purpose of the searches is distinguishable from the general interest in crime control." <u>Id.</u> at 420 (citation modified). Searches of this kind are referred to as "administrative searches," and must meet certain requirements (*not*

---

[15] Due to Thompson's prior concession (and our refusal to allow him to repudiate that concession), our holding today does not resolve the question of whether <u>Patel</u> changed the closely-regulated industry standard under <u>Burger</u>. <u>See</u> <u>Mexican Gulf Fishing Co.</u> v. <u>U.S. Dep't of Com.</u>, 60 F.4th 956, 967 (5th Cir. 2023) (collecting cases).

the Burger test) to pass constitutional muster.  Id.  The Los Angeles ordinance failed to do so.  Id. at 423.

The Patel majority could have stopped there, but it continued to address an alternate position raised by Los Angeles and discussed by Justice Scalia in dissent.  Both Los Angeles and the dissenting Justice believed the challenged regulation should have been considered under the "more relaxed standard" applied to administrative searches of closely-regulated industries (the exception within the exception).  See id. at 424.  The majority disagreed and held that hotels were not part of a closely-regulated industry, making the Burger exception inapplicable.  Patel, 576 U.S. at 424-25.

Despite finding another dispositive basis for dismissing the arguments raised, the Court proceeded to find that the Los Angeles ordinance also failed the second and third Burger criteria. Id. at 426.  In examining the second criterion, the Court first presented Los Angeles's argument "that affording hotel operators any opportunity for precompliance review would fatally undermine the scheme's efficacy by giving operators a chance to falsify their records."  Id. at 427 (citing Brief for Petitioner at 41-42) (emphasis added by us on behalf of Thompson).  The Court rejected this argument because, in its view, officers of the Los Angeles Police Department could still maintain the element of surprise or

otherwise protect the accuracy of hotel records through available, judicially-approved channels such as ex parte warrants.  Id.

With our recap of Patel laid out, Thompson's characterization of Patel's influence on the Burger test flops. Thompson insists that the "necessary" element of the second Burger prong relates back to the "substantial government interest" required in the first prong -- here Maine's conservation and sustainability interests.  Therefore, his argument goes, the MDMR Rule fails because 24/7 GPS tracking is not absolutely necessary to achieving Maine's conservation and sustainability goals.  But Thompson misapprehends the question that we must reckon with.

Both the majority opinion and Justice Scalia's dissent in Patel (along with both pre- and post-Patel caselaw) make clear that the necessity being scrutinized in the second prong of the Burger test is the need for a *warrantless* search to accomplish the regulatory scheme.  See Patel, 576 U.S. at 437 (Scalia, J., dissenting) ("Respondents and the Court acknowledge that *inspections* are necessary to achieve the purposes of the recordkeeping regime, but insist that *warrantless* inspections are not."); id. at 427 (finding "surprise inspection[s]" unnecessary to the "scheme's efficacy"); see also Rivera-Corraliza, 794 F.3d at 220 (reviewing "whether the state's interest justifies warrantless inspections"); Johnson, 104 F.4th at 176-77 (requiring

the government to prove its regulation could only be effectively enforced through a warrantless inspection regime).

As we touched on in our Patel recap, the hotel operators' Fourth Amendment rights were undermined because the proposed government searches did not need to be warrantless. Patel, 576 U.S. at 427. But importantly, the method of the warrantless search -- making hotel records available when police officers request them -- did not influence the Court's analysis. As in, the Court did not agonize over whether it was necessary for Los Angeles police officers to request hotel records in person because they could have made less intrusive requests via email to promote their goal of maintaining accurate hotel registries. See id. at 426. Critically, Thompson asks that we do what the Supreme Court did not. Rather than contesting the general need for warrantless searches in this regulatory scheme, Thompson takes issue solely with the method of search imposed by the MDMR Rule -- constant GPS tracking when a vessel is in the water. This interpretation turns a deaf ear to the music of the Burger test: it is a limited exception to the Fourth Amendment's warrant requirement in closely-regulated industries where the regulatory scheme wouldn't work without warrantless searches, and the scheme provides the functional equivalent of a warrant (the latter being a sneak peek into Burger's third prong).

Furthermore, the position advocated for by Thompson quickly proves untenable.  With elusive (but nevertheless very important) goals such as conservation and sustainability, it would be futile to imagine what level of government conduct would be permissibly "necessary" to achieve them.[16]  So, while Thompson argues that "there are *far* less intrusive ways to improve the fishery data," such as "limit[ing] tracking to vessels fishing for lobsters in federal waters" or "employing lesser 'ping rates,'" his proposals would still amount to *warrantless* searches -- just ones more suited to his preferences.

Our Fourth Amendment precedent has not concerned itself with the necessity of ping rates.  Instead, it has remained focused on protecting individuals from warrantless government searches and jealously protecting the few exceptions to that general rule.  See Rivera-Corraliza, 794 F.3d at 217.  Thus, what Thompson deems the "inherent contradiction" saddled in Burger and its progeny is no more than a boogeyman of his own design.  A warrantless search must be necessary to satisfy the substantial government interest, but the method of conducting such a search need only reasonably serve or advance that interest.  See Burger, 482 U.S. at 709-10;

_____

[16] This court momentarily engaged in this exercise in futility at oral argument, positing various methods of data collection that may be less intrusive, but never solidly "necessary."

Patel, 576 U.S. at 427; Rivera-Corraliza, 794 F.3d at 220; Johnson, 104 F.4th at 176-77.

Due to his presentation of Patel's influence on the Burger test, Thompson does not argue that warrantless searches are unnecessary to Maine's interests. Indeed, Thompson has suggested less intrusive ways to accomplish Maine's goals which nevertheless constitute warrantless searches. We need not dwell on this issue and reiterate that boatloads of caselaw have previously explained why warrantless searches on the high seas are unique. See, e.g., United States v. Villamonte-Marquez, 462 U.S. 579, 593 (1983); United States v. Kaiyo Maru No. 53, 699 F.2d 989, 995-96 (9th Cir. 1983); Lovgren v. Byrne, 787 F.2d 857, 867 (3d Cir. 1986). Additionally, Maine has elucidated why this method of data collection is necessary to their regulatory scheme. The tracking devices on commercial lobster vessels ensure accurate, reliable, and precise data that allows Maine to assess its fishery stock and assist federal whale regulators. Alternative data collection schemes would require Maine lobstermen to turn on and off their tracking devices at certain points or amount to a self-reporting system, either of which could skew their data, thereby frustrating the purposes of the MDMR Rule entirely.

Accordingly, Maine was not on the hook for demonstrating that its chosen method of search was the least restrictive means of achieving its conservation and sustainability interests. The

MDMR Rule satisfies the second Burger prong because warrantless searches are necessary to further the regulatory scheme.

**(2)**

The third and final Burger criterion requires the regulatory scheme, in terms of its certainty and regularity, "provide a constitutionally adequate substitute for a warrant." Burger, 482 U.S. at 703 (citation modified); see also Patel, 576 U.S. at 426. This means the regulation must (1) give notice to those being regulated and (2) limit an inspecting officer's discretion in terms of time, place, and scope. Rivera-Corraliza, 794 F.3d at 216-17 (citing Burger, 482 U.S. at 703).

Thompson's protest under the third Burger criterion necessarily caters to some of the novel questions raised by the MDMR Rule. Thompson does not dispute that the MDMR Rule provides notice of the tracking requirement and the surrounding regulatory scheme. Nor, from what we can tell, does Thompson argue that the MDMR Rule gives any MDMR officials unfettered discretion to conduct searches.[17] Instead, Thompson denounces the MDMR Rule as an impermissible general warrant because "it is *not* sufficiently tailored in scope and time to function akin to an actual, specific

---

[17] The parties mutually describe the search as taking place through the tracking device and not at a later point when the collected data is examined by a government official. Contra Owner-Operator Indep. Drivers Ass'n, 840 F.3d at 895. Accordingly, we will apply the Burger test to this search, as prompted.

warrant." Maine sees the situation differently. The MDMR Rule (it says) only collects a limited and specific type of data -- the location of licensed commercial fishing vessels - that properly limits the scope of the search and the government's discretion.

The MDMR Rule is unique compared to previous search regimes scrutinized under the Burger test. The "searches" are constantly conducted by GPS tracking devices installed on each federally licensed lobsterman's vessel; there are no friendly neighborhood inspectors periodically dropping in unannounced. Compare 13-188 C.M.R. ch. 25, § 98, with Burger, 482 U.S. at 711 (describing a New York law), and Tart v. Massachusetts, 949 F.2d 490, 497-98 (1st Cir. 1991) (describing a Massachusetts law). And this difference cuts both ways for our review. Minimally intrusive, mindless tracking devices remove discretionary judgment calls from the equation entirely, alleviating the concern of any intrusive government officials overstepping their authority. See Tart, 949 F.2d at 498, 499; see also Patel, 576 U.S. at 427. But, in exchange, tracking devices engage in a constant search anytime the predetermined vessels are in the water, testing the limits of the time restrictions considered in the Burger test. See, e.g., Rivera-Corraliza, 794 F.3d at 221. This latter fact limits the persuasiveness of parallels drawn to prior schemes offered by

Maine, but it does not paint the Orwellian picture offered by Thompson, either.[18]

As a whole, the search regime imposed by the MDMR Rule satisfies the third <u>Burger</u> criterion because the searches are non-discretionary across the industry, minimally intrusive, and sufficiently clear in both timing and scope.

Notwithstanding the uniqueness just described, we have previously said that "a regime may pass the <u>Burger</u> test even if there are no time limits," but "context is key." <u>Rivera-Corraliza</u>, 794 F.3d at 221. And that "context" comes down to whether time limits "would make inspections unworkable." <u>Id.</u> To use a tried and tested example, an inspection scheme for commercial trucks cannot have a feasible time restriction because trucks operate twenty-four hours a day. <u>See</u> <u>id.</u> (citing <u>United States</u> v. <u>Ponce-Aldona</u>, 579 F.3d 1218, 1225-26 (11th Cir. 2009)). Thus, a truck regulation limiting inspections to typical business hours would incentivize those seeking to avoid detection to travel solely by night, making the scheme unworkable. <u>See</u> <u>Ponce-Aldona</u>, 579 F.3d at 1226.

---

[18] Thompson seeks to analogize here to Supreme Court caselaw concerning advanced technologies in government searches. But the cases he cites are criminal in nature and involve government searches to uncover evidence of criminal activity. <u>See</u> <u>Carpenter</u> v. <u>United States</u>, 585 U.S. 296, 316 (2018). Therefore, any direct comparison to the MDMR Rule falls short. Furthermore, the Supreme Court has not banned the advancement of technologies used in government searches outright, as Thompson suggests.

So too here. Maine lobstermen may raise or haul their traps at any time, subject to specified seasonal and weekend restrictions. See Me. Stat. tit. 12, § 6440. And, while Thompson frames the MDMR Rule as a "perpetual, technology-driven, and omnipresent search," it only applies to the vessels of federally-licensed lobstermen when they are in the water, and only at a near-constant rate while the vessel is moving. Cf. Tart, 949 F.2d at 498-99. Any other "time limit" would frustrate the regime's design; lobsters are caught in the water and thus lobstermen need to be tracked while they too are in the water. So, the timing and frequency of the searches here, in the context of the statutory scheme, are sufficiently akin to a warrant, as required. See Burger, 482 U.S. at 711 n. 21.

As for scope, the MDMR Rule poses no risk. The tracking devices relay time and position data only, and the Rule does not authorize the search of any vessels more broadly. See Owner-Operator Indep. Drivers Ass'n, 840 F.3d at 896. As such, we fail to see Thompson's perspective of how this amounts to an unlimited scope. The tracking devices do not record and report everything done aboard the vessel; they record a limited and specific type of data and report only that.

Putting everything together, the MDMR Rule, as an administrative search of a closely-regulated industry, passes the Burger test and does not violate the Fourth Amendment.

**IV**

For the reasons above, we **affirm**.  No costs to either
side.